694 F.2d 728
 224 U.S.App.D.C. 162
 The PROCESS GAS CONSUMERS GROUP et al., Petitioners,
v.
U. S. DEPARTMENT OF AGRICULTURE, John R. Block, Secretary of
Agriculture, Respondents,
United Gas Pipe Line Company et al., Intervenors.
UNITED GAS PIPE LINE COMPANY, Petitioner,
v.
U. S. DEPARTMENT OF AGRICULTURE, Bob Bergland, Secretary of
Agriculture, Respondents,
Transcontinental Gas Pipe Line Corporation et al., Intervenors.
The PROCESS GAS CONSUMERS GROUP et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF ENERGY et al., Respondents.
The PROCESS GAS CONSUMERS GROUP et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
American Bakers Association et al., Intervenors.
COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
United Distribution Companies et al., Intervenors.
UNITED DISTRIBUTION COMPANIES, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Consolidated Gas Supply Corporation, Intervenor.
UNITED DISTRIBUTION COMPANIES, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent. (Two cases).
The BROOKLYN UNION GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Service Commission of New York, Intervenor.
STATE OF LOUISIANA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent. (Two cases).
COLUMBIA NITROGEN CORPORATION and Nipro, Inc., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
FIRST MISSISSIPPI CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent. (Two cases).
ATLANTA GAS LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent. (Two cases).
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent. (Two cases).
UNITED GAS PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
The PROCESS GAS CONSUMERS GROUP, American Industrial Clay
Company of Sandersville and Georgia Kaolin
Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
ALLIED CHEMICAL CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
The FERTILIZER INSTITUTE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
The BROOKLYN UNION GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
NATIONAL FOOD PROCESSORS ASSOCIATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
ELI LILLY & COMPANY, Petitioner,
v.
UNITED STATES DEPARTMENT OF ENERGY et al., Respondents.
The PROCESS GAS CONSUMERS GROUP, American Industrial Clay
Company of Sandersville and Georgia Kaolin
Company, Petitioners,
v.
U.S. DEPARTMENT OF AGRICULTURE, Bob Bergland, Secretary of
Agriculture, Respondent,
United Gas Pipe Line Company, et al., Intervenors.
UNITED DISTRIBUTION COMPANIES, Petitioner,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE and Bob Bergland,
Secretary of Agriculture, Respondents,
United Gas Pipe Line Company, et al., Intervenors.
UNITED DISTRIBUTION COMPANIES, Petitioners,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE and Bob Bergland,
Sec. of Agriculture, Respondents,
United Gas Pipe Line Company, et al., Intervenors.
UNITED GAS PIPE LINE COMPANY, Petitioner,
v.
U.S. DEPARTMENT OF AGRICULTURE and Bob Bergland, Secretary
of Agriculture, Respondents,
Brooklyn Union Gas Company, United Distribution Companies,
Intervenors.
The PROCESS GAS CONSUMERS GROUP, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Transcontinental Gas Pipe Line Corp., et al., Intervenors.
UNITED DISTRIBUTION COMPANIES, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
COLUMBIA NITROGEN CORP. and Nipro, Inc., et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Atlanta Gas Light Co., et al., Intervenors.
UNITED DISTRIBUTION COMPANIES, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
United Gas Pipe Line Company, et al., Intervenors.
The PROCESS GAS CONSUMERS GROUP, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
United Distribution Companies, et al., Intervenors.
UNITED GAS PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 79-1336, 79-1713, 79-1346, 79-1449, 79-1511, 79-1534,
79-1557, 79-1568, 79-1569, 79-1585, 79-1610, 79-1617,
79-1655, 79-1765, 79-1813, 79-2259, 79-2273, 79-2297,
79-2314, 79-2323, 79-2352, 79-2361, 79-2368, 79-2369,
79-2409, 79-2435, 79-1497, 79-1581, 79-1588, 79-1814,
79-1635, 79-1699, 79-1727, 79-1815, 79-1823, 79-1824 and 79-1825.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 5, 1980.
Decided July 29, 1981.
As Amended Sept. 29 and Nov. 3, 1981.
Modified on Rehearing En Banc
Oct. 1, 1982.
See 694 F.2d 778.
 
 1
 Petitions for Review of Orders of the U. S. Department of Agriculture. Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 
 
 2
 Michael J. Huston, Indianapolis, Ind., with whom Margaret M. Huff, Indianapolis, Ind., and Peter C. Ward, Washington, D. C., were on the brief, for Eli Lilly & Co., petitioner in No. 79-2409 and intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1585, 79-1635, 79-1713, 79-1815, 79-1823 and 79-1824.
 
 
 3
 Edward J. Grenier, Jr., Washington, D. C., with whom Richard P. Nolan, Robert W. Clark, III, David A. Gross, William Wewer and William H. Penniman, Washington, D. C., were on the brief, for Process Gas Consumers Group, et al., petitioners in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1635, 79-1824 and 79-2259 and intervenors in Nos. 79-1449, 79-1585, 79-1588, 79-1617, 79-1713, 79-1815 and 79-1823.
 
 
 4
 Edward Gerstenfield, Bethesda, Md., with whom Alfred L. Price, Jackson, Miss., was on the brief, for First Mississippi Corp., petitioner in Nos. 79-1610 and 79-1765 and intervenor in Nos. 79-1346 and 79-1713.
 
 
 5
 Stephen A. Herman, Washington, D. C., with whom Kevin R. Jones, Washington, D. C., was on the brief, for The Fertilizer Institute, petitioner in No. 79-2323, and for The Fertilizer Institute, the American Bakers Assn. and Riceland Foods, intervenors in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1635 and 79-2259.
 
 
 6
 David B. Robinson, Washington, D. C., with whom James R. Patton, Jr., and Harry E. Barsh, Jr., Washington, D. C., were on the brief, for State of Louisiana, petitioner in Nos. 79-1569 and 79-2297.
 
 
 7
 Knox Bemis, Washington, D. C., with whom W. DeVier Pierson, Ross Hamachek, Richard A. Yarmey, M. Frazier King, Jr., Terence J. Keeney, Washington, D. C., and Michelle B. Bolton were on the brief, for United Gas Pipe Line Co., petitioner in Nos. 79-1713, 79-1813, 79-1814 and 79-1825 and intervenor in Nos. 79-1336, 79-1346, 79-1497, 79-1581, 79-1585, 79-1588, 79-1823 and 79-1824.
 
 
 8
 J. Richard Tiano, Washington, D. C., with whom John R. Schaefgen, Jr., Washington, D. C., and C. William Cooper, Falmouth, Mass., were on the brief, for United Distribution Companies, petitioner in Nos. 79-1534, 79-1557, 79-1581, 79-1588, 79-1699, 79-1823 and 79-2368 and intervenor in Nos. 79-1346, 79-1449, 79-1497, 79-1511, 79-1585, 79-1635, 79-1713, 79-1814, 79-1815, 79-1824, 79-2259, 79-2297, 79-2314. George L. Weber, Washington, D. C., and C. William Cooper, Falmouth, Mass., also entered appearances for United Distribution Companies.
 
 
 9
 John E. Holtzinger, Jr., Washington, D. C., with whom Paul H. Keck and John T. Stough, Jr., Washington, D. C., were on the brief for Atlanta Gas Light Co., petitioner in Nos. 79-1617 and 79-2435 and intervenor in Nos. 79-1336, 79-1346, 79-1815 and 79-1824.
 
 
 10
 William I. Harkaway and G. Douglas Essy, Chicago, Ill., were on the brief for Consolidated Edison Co. of New York, Inc., petitioner in Nos. 79-1655, 79-1727 and 79-2314 and intervenor in Nos. 79-1346 and 79-1449.
 
 
 11
 Charles M. Darling, IV, and David T. Douthwaite, Washington, D. C., were on the brief for Allied Chemical Corp., petitioner in No. 79-2273 and intervenor in No. 79-1449.
 
 
 12
 Fred K. Harvey, Jr., Augusta, Ga., was on the brief for Columbia Nitrogen Corp., et al., petitioner in Nos. 79-1585 and 79-1815 and intervenor in Nos. 79-1336, 79-1346 and 79-1824.
 
 
 13
 Nicholas W. Fels and Eric A. Eisen, Washington, D. C., were on the brief, for Air Products & Chemicals Inc., et al., for petitioner in No. 79-2369 and intervenor in Nos. 79-1336, 79-1346, 79-1449 and 79-1824.
 
 
 14
 Bruce G. Forrest, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Anthony J. Steinmeyer, Atty., Dept. of Justice, Terrence G. Jackson, Atty., Dept. of Agriculture and Arthur S. Weissbrodt, Atty., Dept. of Energy, Washington, D. C., were on the brief for respondents in Nos. 79-1336, 79-1346, 79-1497, 79-1581, 79-1588, 79-1713, 79-1814 and 79-2409.
 
 
 15
 Robert S. Greenspan and Ronald R. Glancz, Attys., Dept. of Justice, Washington, D. C., also entered appearances, for Dept. of Agriculture, et al.
 
 
 16
 J. Paul Douglas, Asst. Sol., Federal Energy Regulatory Commission, Washington, D. C., with whom Jerome Nelson, Sol., FERC, Washington, D. C., was on the brief, for respondent in Nos. 79-1449, 79-1511, 79-1534, 79-1557, 79-1568, 79-1569, 79-1585, 79-1610, 79-1617, 79-1635, 79-1655, 79-1699, 79-1727, 79-1765, 79-1813, 79-1815, 79-1823, 79-1824, 79-1825, 79-2259, 79-2297, 79-2314, 79-2323, 79-2352, 79-2361, 79-2368, 79-2369 and 79-2435.
 
 
 17
 Howard E. Shapiro, Atty., FERC, Washington, D. C., also entered an appearance for respondent, FERC.
 
 
 18
 Gregory Grady with whom Dale A. Wright, Washington, D. C., Thomas E. Midyett, Jr., Knoxville, Tenn., for East Tennessee Natural Gas Co., et al., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1511, 79-1585, 79-1815 and 79-1823.
 
 
 19
 Edwin H. Pewett, Allan I. Mendelsohn and Michael J. Ruane, Washington, D. C., were on the brief for National Meat Assn., intervenor in Nos. 79-1336, 79-1346, 79-1449 and 79-1497.
 
 
 20
 Charles S. Rogers and Stephen Shanbour, Asst. Attys. Gen., State of Okl., Oklahoma City, Okl., were on the brief for State of Okl., intervenor in Nos. 79-1449, 79-1497, 79-1585 and 79-2259.
 
 
 21
 J. David Hughes and Stuart Fryer, Asst. Attys. Gen., State of Tex., Austin, Tex., were on the brief, for State of Tex., intervenor in Nos. 79-1449, 79-1497 and 79-1585.
 
 
 22
 Keith R. McCrea and Douglas O. Waikart, Washington, D. C., were on the brief, for Glass Packaging Institute, intervenor in No. 79-1449.
 
 
 23
 William A. Mogel, Washington, D. C., was on the brief, for Farmland Industries, Inc., et al., intervenor in Nos. 79-1346, 79-1449, 79-1497 and 79-1585.
 
 
 24
 Albert J. Feigen, Washington, D. C., was on the brief for American Sugar Cane League of the U.S.A., Inc., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497 and 79-1365, and was on the brief for National Soybean Processors Assn., et al., intervenor in Nos. 79-1336, 79-1449, 79-1497, 79-1511, 79-1534, 79-1568, 79-1585, 79-1610 and 79-1823.
 
 
 25
 Joseph M. Creed, Washington, D. C., was on the brief for Biscuit & Cracker Manufacturers' Assn., intervenor in Nos. 79-1449 and 79-1497.
 
 
 26
 Joseph S. Fontana, Washington, D. C., was on the brief for Corn Refiners Assn., intervenor in No. 79-1497.
 
 
 27
 Richard S. Harrell, Washington, D. C., was on the brief, for Distilled Spirits Council of the United States, Inc., intervenor in Nos. 79-1336, 79-1449, 79-1497, 79-1585, 79-1713 and 79-1823.
 
 
 28
 Allen K. Harris, Oklahoma City, Okl., was on the brief, for High Plains Gas Consumers Group, intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1585, 79-1815, 79-1823 and 79-1824.
 
 
 29
 Donald E. Graham, Washington, D. C., was on the brief, for National Council of Farmers Cooperatives, intervenor in Nos. 79-1336, 79-1449, 79-1497, 79-1585 and 79-1824.
 
 
 30
 Gerard Paul Panaro, Washington, D. C., was on the brief, for Retail Bakers of America, intervenor in No. 79-1336.
 
 
 31
 James W. Riddell and John E. Gillick, Washington, D. C., were on the brief, for the United States Brewers Assn., Inc., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1511, 79-1635, 79-1699, 79-1713, 79-1815, 79-1823 and 79-1824.
 
 
 32
 Michael J. Manning and Patrick J. Keeley, Washington, D. C., were on the brief, for ENTEX, Inc., intervenor in No. 79-1449.
 
 
 33
 Lewis Carroll and Susan Low, Washington, D. C., were on the brief, for Washington Gas Light Co., intervenor in No. 79-1449.
 
 
 34
 Joseph P. Stevens, William R. Coleman and Alvin Adelman, Brooklyn, N.Y., were on the brief, for Brooklyn Union Gas Co., petitioners in Nos. 79-1568 and 79-2361 and intervenors in Nos. 79-1336, 79-1346, 79-1449, 79-1635, 79-1699, 79-1814 and 79-2259.
 
 
 35
 John M. Hill, Giles D. H. Snyder, John D. Daly and Stephen J. Small, Charleston, W. Va., were on the brief, for Columbia Gas Transmission Corp., petitioner in Nos. 79-1511 and 79-2352 and intervenor in Nos. 79-1497, 79-1585, 79-1635, 79-1815 and 79-1823.
 
 
 36
 Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of N. Y., Albany, N. Y., and Richard A. Solomon, Washington, D. C., were on the brief, for Public Service Commission of the State of N. Y., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1511, 79-1568, 79-1585, 79-1713, 79-1823, 79-1824 and 79-2259.
 
 
 37
 Roy R. Robertson, Jr., William A. Major, Jr. and Ronald L. Kuehn, Jr., Birmingham, Ala., were on the brief, for Southern Natural Gas Co., intervenor in Nos. 79-1449, 79-1585 and 79-1610.
 
 
 38
 Melvin Richter, Washington, D. C., was on the brief, for The Great Western Sugar Co., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1511, 79-1585, 79-1815 and 79-1824.
 
 
 39
 George J. Meiburger and Frank X. Kelly, Washington, D. C., were on the statement in lieu of brief, for Northern Natural Gas Co., intervenor in Nos. 79-1346, 79-1449, 79-1497 and 79-2273.
 
 
 40
 William W. Bedwell, Washington, D. C., was on the statement in lieu of brief, for Mississippi River Transmission Corp., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1824, 79-2259 and 79-2314.
 
 
 41
 Thomas F. Ryan, Richard T. Boone and Robert G. Hardy, Washington, D. C., entered appearances for Transcontinental Gas Pipe Line Corp., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1585, 79-1635, 79-1713, 79-1815, 79-1823, 79-1824 and 79-1825.
 
 
 42
 John P. Furman, Washington, D. C., entered an appearance for Kansas-Nebraska Gas Co., Inc., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497, 79-1815, 79-1823, and 79-1824.
 
 
 43
 Ronald D. Eastman and Lynda S. Mounts, Washington, D. C., entered appearances for American Textile Manufacturers Institute, Inc., intervenor in Nos. 79-1336, 79-1346, 79-1449, 79-1497 and 79-1585.
 
 
 44
 Malcolm H. Furbush, Joseph S. Englert, Jr. and Peter W. Hanschen, San Francisco, Cal., entered appearances, for Pacific Gas & Electric Co., intervenor in Nos. 79-1336 and 79-1346.
 
 
 45
 Ridgon H. Boykin, New York City, entered an appearance for American Paper Institute, Inc., intervenor in Nos. 79-1449, 79-1497 and 79-1713.
 
 
 46
 Christopher T. Boland and John F. Harrington, Washington, D. C., entered appearances for Texas Gas Transmission Corp., intervenor in Nos. 79-1823 and 79-1824.
 
 
 47
 Frederick Moring and Joseph M. Oliver, Jr., Washington, D. C., entered appearances for New Jersey Natural Gas Co., intervenor in Nos. 79-1449 and 79-1727.
 
 
 48
 G. William Fowler, Odessa, Tex., entered an appearance for West Texas Gas, Inc., intervenor in No. 79-1497.
 
 
 49
 Karol Lyn Newman, Washington, D. C., entered an appearance for Consolidated Gas Supply Corp., intervenor in Nos. 79-1449, 79-1511, 79-1534 and 79-1585.
 
 
 50
 Harold L. Talisman, Washington, D. C., and A. S. Lacy, Birmingham, Ala., entered appearances for Alabama Gas Corp., intervenor in No. 79-1449.
 
 
 51
 F. Kent Burns, Raleigh, N. C., and Donald W. McCoy, Fayetteville, N. C., entered appearances for Public Service Co. of North Carolina, Inc., et al., intervenor in No. 79-1449.
 
 
 52
 John S. Fick, Los Angeles, Cal., entered an appearance for Southern California Gas Co., intervenor in Nos. 79-1449 and 79-2297.
 
 
 53
 Before MacKINNON, ROBB and WALD, Circuit Judges.
 
 
 54
 Opinion PER CURIAM.
 
 
 55
 Circuit Judge WALD dissents in part.
 
 
 56
 PER CURIAM.
 
 
 57
 Before the court are petitions for review of the interrelated actions of the Department of Agriculture (USDA), the Department of Energy (DOE), and the Federal Energy Regulatory Commission (FERC). These actions implemented provisions of Title IV of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. Sec. 3391 et seq., which require the creation of rules to govern the natural gas curtailment plans of interstate pipelines.
 
 
 58
 The NGPA was in part a reaction to the effects that recurring natural gas shortages were having on agricultural production. The pipelines had been required to file "curtailment plans" for the allocation of natural gas deliveries among the pipelines' customers in times of shortage. Section 401(a) of the NGPA, 15 U.S.C. Sec. 3391(a), directed the Secretary of Energy to promulgate, by March 9, 1979, rules to protect "essential agricultural users" from curtailment of natural gas deliveries, except to the extent that curtailment was necessary to reserve natural gas for certain "high priority users" or was consistent with the "requirements of full food and fiber production."
 
 
 59
 The NGPA required action not only by DOE but also by USDA and FERC, a commission within DOE. Section 401(c) of the NGPA states that the Secretary of Agriculture shall certify to DOE and FERC the natural gas requirements for "essential agricultural use," which is defined as that natural gas use "which the Secretary ... determines is necessary for full food and fiber production." Id. at Sec. 401(f)(1), 15 U.S.C. Sec. 3391(f)(1). FERC is then directed by section 401(b) of the NGPA to consult with USDA and determine if any of the essential agricultural users should be deprived of a section 401(a) priority because of the availability of an economically practicable alternate fuel. FERC is also charged under section 403(b), 15 U.S.C. Sec. 3394(b), to implement the curtailment priorities that are to be prescribed by DOE, id. at Sec. 403(a).
 
 
 60
 The Secretary of Agriculture conducted a rulemaking proceeding pursuant to his section 401(c) & (f)(1) directive and on March 1, 1979 issued an interim final rule. On May 10, 1979, USDA issued its final rule and its Final Economic and Environmental Impact Statement, which stated that environmental impacts were not significant. The final rule certified that agricultural users are to receive 100% of actual current requirements (rather than some percentage of past usage). Petitioners challenge both the adequacy of USDA's Impact Statement (See Part III.A infra) and the propriety of its section 401(c) certification (See Part II.A.1.).
 
 
 61
 DOE, meanwhile, was preparing, through its Economic Regulatory Administration (ERA), a proposed rule under section 401(a) of the NGPA to define the scope of the "high priority uses" that would receive preference over essential agricultural uses in pipeline curtailment plans. Section 401(f)(2) of the NGPA defines "high-priority user" to include homes, schools, hospitals, small businesses, and those who use natural gas to maintain life, health, or physical property. ERA's final rule provided (1) that the "life-health" part of the statutory definition should not cover the use of natural gas to produce health-related products such as pharmaceuticals; (2) that one may be a high priority user without demonstrating the lack of an alternative fuel; and (3) that plant protection gas is entitled to high priority only when operations of the plant are shut down. Various petitioners challenge all three of these conclusions. (See Parts II.B.1, II.B.2, II.B.4.).
 
 
 62
 FERC engaged in rulemaking to implement the determinations of USDA and ERA. After adopting an interim rule effective through the end of October 1979, it adopted on May 2, 1979 a final rule in its Order No. 29, which was clarified or modified in Orders Nos. 29-A, 29-B, and 29-C.[1] The final rule, although adopting USDA's certification of volumetric requirements for essential agricultural use on the basis of current demand, does not require pipelines to deliver quantities of natural gas in excess of the volumetric limitations established by existing contracts or certificates of public necessity and convenience. Agricultural petitioners challenge the contract or certificate limitation, while industrial petitioners challenge the adoption of USDA's certification of current demand. (See Part II.A.2.) At the same time, in another challenged decision, FERC determined that the requirements for "high priority users" could be calculated by reliance on historical usage. (See II.A.3.) A third challenged aspect of the rule is its provision of an attribution mechanism to permit persons receiving gas from more than one source to allocate their priority needs among the sources. (See Part I.C.)
 
 
 63
 Also challenged here are a number of omissions from the rule. FERC declined to address the treatment of "capacity curtailments," which are caused by insufficient pipeline facilities (as opposed to insufficient supply of natural gas), leaving this problem to be remedied by the complaint procedures of the Natural Gas Act, 15 U.S.C. Sec. 717. This decision is challenged by agricultural petitioners. (See Part I.A.) Agricultural petitioners also challenge FERC's refusal to require the pipelines to monitor the redelivery of natural gas by local distribution companies to see if gas delivered for essential agricultural uses actually reaches them. (See Part I.B.) Other petitioners challenge FERC's decision basically to maintain the existing priorities accorded to storage gas. (See Part II.B.3.) A final challenge to Order No. 29 is that FERC erred in deciding to consider the alternate fuel capability of essential agricultural users in a separate rulemaking proceeding. (See Part III.B.)[2]
 
 
 64
 Meanwhile, in another proceeding also involved in these consolidated cases, FERC adopted, in Order No. 27, a rule implementing section 608 of the Public Utility Regulatory Policies Act of 1978, which clarified FERC's power to authorize, by issue of certificates of public convenience and necessity, direct sales of natural gas for "high-priority uses, as defined, by rule, by the Commission." The "high-priority use" definition developed in FERC's final rule included essential agricultural users protected by NGPA section 401. Petitioners challenge FERC's decision to limit its certificate to terms of five or ten years and to exclude from the program natural gas from the Outer Continental Shelf. (See Part II.B.5.)
 
 
 65
 We generally affirm the rulemakings in question, but vacate and remand to FERC for further proceedings concerning its imposition of base-year volumetric limits on high priority users and its denial of high priority status to plant protection gas used in operating plants.
 
 
 66
 It is imperative to define from the outset the narrow scope of our review, which was emphasized by the Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971):
 
 
 67
 [The reviewing court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. [Emphasis added.]
 
 
 68
 This court has described the standard of review as involving three parts:
 
 
 69
 First, to insist upon an explanation of the facts and policy concerns relied on by the Agency in making its decisions; second, to see if those facts have some basis in the record; and finally, to decide whether those facts and those legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made.
 
 
 70
 Weyerhauser Co. v. Costle, 590 F.2d 1011, 1027 (D.C.Cir.1973). It is clear from these cases that the scope of review is severely circumscribed. It does not allow us to approach the case from the angle of what we consider preferable, but rather requires us to decide whether the choice elected by the responsible agency is within the ambit of its discretion, and supported by the record, that is, whether it is the product of reasoned decision making.
 
 I. DEFINING THE CURTAILMENT PLANS' COVERAGE
 A. Capacity Curtailment
 
 71
 The final rule promulgated by FERC applies only to curtailments caused by shortages in supply; it excludes curtailments caused by a pipeline's lack of capacity to deliver the gas it has agreed to deliver. 18 C.F.R. Sec. 281.203(a)(6), Joint Appendix (J.A.) at 344.
 
 
 72
 The Agricultural Petitioners argue that FERC's rules should implement the priorities established by the NGPA for capacity curtailments as well as supply curtailments.[3] They contend that the NGPA does not distinguish between supply curtailments and capacity curtailments, noting that the statute provides that "no curtailment plan of an interstate pipeline" may provide for curtailment except in accord with the priorities it establishes. NGPA Secs. 401, 402, 15 U.S.C. Secs. 3391, 3392. Petitioners point out the effects of curtailment upon users of gas are the same, regardless of whether the curtailment is caused by inadequate supply or inadequate capacity.
 
 
 73
 United Gas Pipe Line Company argues in its intervenor's brief that capacity curtailments are unique and are unsuited to resolution by imposition of end-use priorities. It argues that this is a strong indication that Congress did not intend the NGPA to apply to capacity curtailments.
 
 
 74
 The Commission, while arguing that "[i]t was supply, not capacity, curtailments which provided the impetuous [sic] for introduction of legislation which became the NGPA," Br. at 55 (citing H.R.Rep.No.95-543, Vol. II at 383-92, 537 (1977); S.Rep.No.95-436 at 8, 15-16, 17-19, 25 (1977) U.S.Code Cong. & Admin.News 1978, p. 7659), does not contend that the NGPA is inapplicable to capacity curtailments. Its decision on rehearing noted that curtailments in recent years have largely been caused by supply shortages and that capacity curtailments have been relatively rare. It therefore declined to prescribe a general rule applicable to capacity curtailments, stating that persons faced with capacity curtailments who believe that the NGPA should be applicable to them "may avail themselves of their Natural Gas Act remedies." J.A. 405. These remedies include the filing of a complaint pursuant to section 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d, alleging that a pipeline's existing curtailment plan is "unjust, unreasonable, unduly discriminatory, or preferential," because it does not apply to capacity curtailments. They may also seek an adjustment requiring that FERC's rules on curtailment as applied to a particular pipeline be modified to include capacity curtailments. See 18 C.F.R. Sec. 1.41 (1980). In short, FERC's refusal to prescribe a general rule for capacity curtailments reflects the agency's desire to deal with such curtailments by order on a case-by-case basis as they arise.
 
 
 75
 We cannot say that the Commission erred in approaching capacity curtailments in this manner, in view of the relative rarity of capacity curtailments in recent years and the substantial discretion afforded to agencies in choosing whether to approach a particular problem by general rulemaking or order. See NAACP v. FPC, 425 U.S. 662, 668, 96 S.Ct. 1806, 1810, 48 L.Ed.2d 284 (1976); NLRB v. Bell Aerospace Co., 416 U.S. 267, 291-295, 94 S.Ct. 1757, 1770-1772, 40 L.Ed.2d 134 (1974); SEC v. Chenery Corp., 332 U.S. 194, 202-203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); Office of Communications of the United Church of Christ v. FCC, 191 U.S.App.D.C. 360, 368, 590 F.2d 1062, 1070 (1978); British Caledonian Airways, Ltd. v. CAB, 190 U.S.App.D.C. 1, 11-12, 584 F.2d 982, 992-993 (1978).
 
 
 76
 We do not view the agency's action as deciding that the NGPA's curtailment priorities are not applicable to capacity curtailments. Rather, it has decided to await a specific case before dealing with that issue.[4] Accordingly, we express no opinion on this question.
 
 B. The Pass-Through or "Tracing" Issue
 
 77
 The final rule adopted by FERC delineates the methods by which interstate pipelines are to calculate the volume of high priority and essential agricultural gas each should deliver to local distributors. The rule does not require local distributors to follow the same scheme of priorities when delivering the gas to end users. The Agricultural Petitioners[5] argue that the Commission has run afoul of section 401 of the NGPA and section 4(b) of the Natural Gas Act, 15 U.S.C. Sec. 717 et seq., by not extending the priority rules to the local distributors.
 
 
 78
 Petitioners' NGPA argument is based on the language of section 401(a), which provides that:
 
 
 79
 [t]he Secretary of Energy shall prescribe and make effective a rule ... which provides that, notwithstanding any other provision of law ... and to the maximum extent practicable, no curtailment plan of an interstate pipeline may provide for curtailment of deliveries of natural gas for any essential agricultural use, unless such curtailment--
 
 
 80
 (1) does not reduce the quantity of natural gas delivered for such use below the use requirement [certified by the Secretary of Agriculture pursuant to section 401(c)]; or
 
 
 81
 (2) is necessary in order to meet the requirements of high-priority users.
 
 
 82
 15 U.S.C. Sec. 3391(a). By this Act Congress instructed the Secretary of Energy to prohibit curtailment plans which cut down the amount of gas available for essential agricultural use for any reason other than making such gas available for high-priority users.
 
 
 83
 Petitioners argue that any interstate pipeline curtailment plan that does not contain provisions requiring local distributors receiving gas from the pipeline to deliver gas according to the priorities of the pipeline's curtailment plan violates section 401(a). According to petitioners, curtailment plans that do not require the interstate pipelines to police the compliance of local distributors will allow the local gas companies to take delivery of high-priority gas or essential agricultural gas and deliver it to any and all customers. Petitioners want the Commission to require the interstate pipelines to condition delivery of priority gas on the local distributors' promise to follow the priority scheme. According to the petitioners the lack of such provisions in the curtailment plan of an interstate pipeline renders the plan one that "provide[s] for the curtailment of deliveries of natural gas for any essential agricultural use".
 
 
 84
 We think section 401(a) was not intended to reach the activities of local distributors. The statutory language refers to the curtailment plans of interstate pipelines. During the progress of the NGPA through the Congress the House adopted language which did reach the activities of local gas companies. Section 411(a) of H.R. 8444 provided that:
 
 
 85
 Notwithstanding any other provision of law, no pipeline company and no local distribution company may curtail deliveries to any person who uses natural gas for any agricultural use identified as an essential agricultural use by the Secretary of Agriculture ...
 
 
 86
 H.R. 8444, 95th Cong., 2d Sess. Sec. 411(a) (1978); 123 Cong.Rec. 26169-70 (1978). This language did not survive the action of the Conference Committee. H.R.Rep.No.95-1752 at 111-113, 95th Cong., 2d Sess. (1978). U.S.Code Cong. & Admin.News 1978, p. 7659. The language of section 401(a) does not mention the practices of local distributors. The fair inference from the exclusion of the language of the House Bill is that local distributors are not covered.
 
 
 87
 The Agricultural Petitioners respond to this legislative history by arguing that the Commission will not be required to regulate the local distributors if the Commission can require the interstate pipelines to do so. The Petitioners contend that the interstate pipeline should be required to police the priority scheme of the Act through restrictions on delivery of priority gas to nonpriority customers.
 
 
 88
 We think that if Congress had desired to mandate such a system for regulating the thousands of local gas companies in the United States it would have used language similar to that found in section 411(a) of H.R. 8444. While the language that was adopted prohibits interstate pipeline curtailment plans which would divert gas from priority users, it does not prohibit interstate curtailment plans which may result in such diversion by local distributors.
 
 
 89
 The Agricultural Petitioners also assert that the Commission's final rule will allow the interstate pipelines to file curtailment plans which promote discrimination between local distributors and between end users of natural gas. They argue that the Commission's rule does not comply with section 4(b) of the Natural Gas Act, which provides that:
 
 
 90
 No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission,
 
 
 91
 (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or
 
 
 92
 (2) maintain any unreasonable difference in rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service.
 
 
 93
 15 U.S.C. Sec. 717c(b).
 
 
 94
 This court held in North Carolina v. FERC, 584 F.2d 1003 (D.C.Cir.1978) that under section 4(b) "discrimination resulting from an end-use plan can be justified only to the extent that the plan actually does protect high-priority uses from curtailment ahead of low priority uses." Id. at 1012 (emphasis in original). Under the North Carolina rule the Commission must scrutinize a curtailment plan to see if its provisions would effectuate the delivery of priority gas to priority customers.
 
 
 95
 The Agricultural Petitioners assert that, because the interstate pipelines will curtail delivery of gas to the distributors without requiring all local distributors to pass on the gas, undue discrimination will result. Local distributors that do pass through in accordance with the priorities will be disadvantaged as compared with those distributors that ignore the priority scheme.
 
 
 96
 There is undoubtedly discrimination present when an interstate pipeline delivers more gas to one local distributor than another based on the priority of the local customers. The delivery of differing volumes of gas to local distributors is discrimination that is essential to the protection of high priority and essential agricultural gas users. That plans filed under the Commission's rule will not force the distributors to pass through the priority gas, however, does not render such discrimination "undue" under section 4(b). The discrimination would be present either with such provisions or without. Nothing in the North Carolina case requires the Commission to regulate local distributors because some of them may frustrate the priority scheme contained in an interstate pipeline curtailment plan.
 
 
 97
 The Agricultural Petitioners also assert that the curtailment plans filed under the Commission's rule will impermissibly discriminate between direct customers of the pipelines and those customers who receive their gas through a local distribution company ("indirect customers" of the pipeline). The Petitioners cite Sebring Utility Comm'n v. FERC, 591 F.2d 1003 (5th Cir.), cert. denied, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979) as their authority. The Sebring case involved a pipeline that curtailed service to all direct customers before curtailing service to indirect customers, regardless of priority. Petitioners cannot say that the Commission's final rule allows the interstate pipelines to ignore the priority scheme of the NGPA; instead they contend that a local distributor might deliver priority gas to a non-priority customer. They argue that such action should be attributed to the interstate pipeline that failed to prevent such action. We think, however, that absent some action on the part of the interstate pipeline to cause such a diversion of priority gas the decisions of the local distributors are not attributable to the interstate pipelines; the pipelines would not violate section 4(b) by delivering gas according to the priority scheme of the Commission's final rule.
 
 C. Allocation Formula
 
 98
 In Order Nos. 29[6] and 29-C,[7] FERC promulgated a rule establishing a mechanism for determining what percentage of a high-priority customer's needs must be filled by a gas pipeline that had been one of several suppliers to the customer. The rule provides that each pipeline is responsible for supplying a proportion of the customer's high-priority gas needs equal to the pipeline's percentage contribution to the customer's total needs during the base period.[8]
 
 
 99
 The state of Louisiana and several intervenors[9] ("petitioners") challenge the rule's allocation formula, arguing that it violates the non-discrimination[10] and procedural requirements[11] of the Natural Gas Act (NGA), 15 U.S.C. Sec. 717 et seq., and fails to implement the curtailment priorities[12] of the NGPA. We find that the challenged orders fall within FERC's regulatory powers, and that petitioners' other arguments are premature given the acknowledged availability of an adjustment procedure. We thus affirm the facial validity of the regulation.
 
 
 100
 The interim rule[13] promulgated by FERC did not require a specific allocation mechanism. Rather, it directed pipelines to amend their tariffs to provide special relief from curtailment where such relief would be needed to assure delivery of gas to agricultural and high-priority users who would otherwise be curtailed. The gist of petitioners' argument is that only such an ad hoc approach is capable of fulfilling the non-discrimination requirement of the NGA as well as effectuating the curtailment priorities established in the NGPA, and thus that the final rule is unlawful on its face. Specifically, petitioners point out that utilization of FERC's allocation formula generates results consistent with the statutory demands only when all pipeline suppliers of a given customer are suffering from the same percentage curtailment in each priority category; in the absence of such identity in curtailment conditions, as was often the case during the gas shortage,[14] high-priority customers of a pipeline could be curtailed while lower-priority needs of customers of the same pipeline were still being serviced.[15]
 
 
 101
 Petitioners rely on our decision in North Carolina v. FERC, supra, for support of their contention that the specification of an allocation mechanism is inherently violative of the statutory commands of the NGA.[16] In that case, the court held that FERC could not impose a curtailment plan with a similar allocation mechanism on a pipeline without considering the actual end-use impact of the plan. The court held that such plans were inherently discriminatory;[17] the only question was thus whether the discrimination was "unreasonable" within the meaning of section 4(b) of the NGA.[18] Acknowledging that discrimination "necessary to assure parity of treatment for equivalent end uses" could be reasonable,[19] the court remanded the case for consideration of whether the plan at issue would in fact assure parity in that particular case.
 
 
 102
 In short, petitioners rely on a case holding enforcement of a curtailment plan in a particular situation arbitrary and capricious on the record of that proceeding for the proposition that the regulation adopting portions of that plan as a model is per se unlawful, a logical leap specifically disclaimed by the panel in the earlier case.[20] As FERC has pointed out, see Supplemental Br. for Respondent FERC at 7, different standards guide our review of the Commission's promulgation of a rule, and its implementation in a given case. In promulgating general rules, the Commission is not required to determine, and take into account, the actual impact of the rule on each person subject to the rules. See United States v. Florida East Coast Ry., 410 U.S. 224, 246, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972); Permian Basin Area Rate Cases, 390 U.S. 747, 768-774, 88 S.Ct. 1344, 1360-1363, 20 L.Ed.2d 312 (1968). Rather, it is free to "reason from the particular to the general," Assigned Car Cases, 274 U.S. 564, 583, 47 S.Ct. 727, 733, 71 L.Ed. 1204 (1927), and to correct any resultant inequities and hardships by providing exemption procedures. United States v. Allegheny-Ludlum Steel Corp., supra, 406 U.S. at 755, 92 S.Ct. at 1949 (citing Permian Area Rate Cases, supra, 390 U.S. at 784-786, 88 S.Ct. at 1368-1369).
 
 
 103
 In the instant case, the Commission recognized that the allocation formula promulgated in Order Nos. 29 and 29-C might not be the most appropriate rule in all circumstances. Indeed, in Order No. 29-C, the Commission noted:
 
 
 104
 In applying Order No. 29, the Commission has not been inflexible. Where the rule was obviously unsuited to the system of a particular pipeline, it has not been applied. The Commission has also evinced flexibility in molding curtailment plans in the settlement context.
 
 
 105
 If petitioners believe the rule unsuited to individual pipeline curtailment plans, the appropriate avenue for relief is a 502(c) adjustment or offer of settlement, not rehearing of the rule.[21]
 
 
 106
 Some of the petitioners seem to have already successfully utilized this adjustment process.[22]
 
 
 107
 Petitioners nonetheless claim the adjustment process is inadequate to solve the problems generated by the challenged rule. First, they contend that the adjustment procedure lacks necessary safeguards. However, we neither find nor were given any support for the proposition that the missing safeguards[23] are necessary.[24] Second, petitioners argue the adjustment procedures are likely to be useless, when viewed in the context of the Commission's stated views and actions on related subjects.[25] This fear has not been borne out by actual experience;[26] more importantly, we are not inclined to strike down a rule merely because of a petitioner's fear that the implementing agency may not conduct exemption proceedings in good faith. If the agency actually abuses its authority by refusing in an arbitrary, capricious or unreasonable manner to grant exemptions, petitioners will have every opportunity to attack those refusals at that time.
 
 
 108
 Finally, petitioners argue that the rule is defective because it "implement[s] and chang[es] curtailment programs" without utilizing the procedural mechanisms established in sections 4 and 5 of the NGA. Petitioners' argument that pipelines must be free to file tariffs without regulatory restraint, however, is contradicted by the words of the applicable statutes[27] and judicial precedent.[28] The Commission is free to announce constraints on tariff filings in the form of rules, though it must accept or reject rates on their individual merits.[29]
 
 
 109
 FERC acted within its authority in promulgating the challenged portions of Order Nos. 29 and 29-C. As yet, petitioners have presented no evidence of any abuses in their implementation. The action of the Commission is therefore upheld.
 
 II. IMPLEMENTATION OF STATUTORY PRIORITIES
 
 110
 A. Setting Volumetric Requirements for Agricultural and High Priority Users
 
 
 111
 1. Certification by the Secretary of Agriculture
 
 
 112
 A major issue in this case is whether USDA erred in certifying that agricultural users are to receive 100% of their demand during curtailment periods. Under the statute, the Secretary of Agriculture is required to certify to the Secretary of Energy and the Commission the natural gas requirements for essential agricultural uses in order to sustain "full food and fiber production." NGPA Sec. 401(c), 15 U.S.C. Sec. 3391(c). The statute defines "essential agricultural use" broadly to include both the production and processing of food and natural fibers, including the production of animal feed, fertilizer, and irrigation as well as the more direct uses of natural gas for agricultural uses. NGPA Sec. 401(f)(1)(A), (B), 15 U.S.C. Sec. 3391(f)(1)(A), (B). Resolution of this issue turns on whether USDA correctly interpreted the term "full food and fiber" production in the NGPA. One alternative which USDA could have elected and which is urged in opposition to its 100%-of-demand certification is to limit agricultural users to the amount they consumed during a designated base period. Another alternative would be to allow agriculture users to receive the entirety of their requirements. USDA chose the latter course. The industrial petitioners object to the failure to use a base period measurement as a ceiling. After a careful review of the statute, its legislative history, and the record we find no abuse of discretion by USDA in selecting the certification option which it did.
 
 
 113
 Because of the high priority status accorded agricultural users by the NGPA, natural gas users with a lower priority argue that failure to use a historical base period permits too high a reliance by agricultural users on natural gas, and would not permit an equitable distribution of limited supplies in times of curtailment. Although the statute and its accompanying legislative history are not crystal clear, we affirm the decision of the USDA to certify 100% of current demand without limitations imposed by use of a historical base period.
 
 
 114
 The starting point in making this determination is the text of the statute itself. NGPA Sec. 401(c) provides that the Secretary of Agriculture
 
 
 115
 shall certify to the Secretary of Energy and the Commission the natural gas requirements (expressed either as volumes or percentages of use) of persons (or classes thereof) for essential agricultural uses in order to meet the requirements of full food and fiber production. [Emphasis added.]
 
 
 116
 The provision's definitional section, 401(f)(1), defines "essential agricultural use" as one which the Secretary of Agriculture determines is necessary to meet the full food and fiber production level, whether used directly in production, processing, or storage, or as a feedstock for fertilizer, agricultural chemicals, animal feed or food. NGPA Sec. 401(f)(1)(A), (B). That is comprehensive language.
 
 
 117
 In the absence of any more precise indication from Congress we are left with the task of winnowing the Congressional intent from the text of the statute. In so doing, we give appropriate weight to the interpretation of the statute by the agencies charged with its implementation, USDA and ERA (acting under authority delegated by DOE). Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); United States v. Rutherford, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979); Kyle v. ICC, 609 F.2d 540, 542 (D.C.Cir.1979). The Secretary of Agriculture determined that the statute referred to current demand at the time of the curtailment, thereby rejecting recourse to any historical base periods. The language of the statute and its legislative history are not inconsistent with that interpretation. We therefore affirm that construction.
 
 
 118
 The record is replete with examples of wasted food, and destroyed fiber, which occurred because of the interruption of natural gas supplies. USDA's public notice, instituting its notice-and-comment rulemaking proceeding, addressed in its background section the importance of natural gas to food and fiber production.[30]
 
 
 119
 Congress was sufficiently concerned with the possible recurrence of this agricultural waste that it explicitly accorded agricultural users a high priority, and used an expansive definition of agricultural processes. Those policy choices are clear. Equally apparent is the fact that Congress necessarily was aware that expansion of high priority use was at the expense of users further down the priority chain of natural gas consumers, but no less dependent upon gas as an indispensable fuel, or feedstock. But in providing for the allocation of a scarce resource in a time of supply crises, Congress elected to define explicitly certain classes of users, and uses, and define other classes of users or uses with less precision. Congress also established a two tier system to implement this priority system, beginning with the consideration and promulgation of regulations by the agencies, subject to appellate review. This is the stage of the proceeding with which we are here concerned.
 
 
 120
 In evaluating the USDA determination, we return to the basic premise underlying the NGPA. In the most simple terms, it established a method of allocating an important natural resource in a time of supply curtailments. In more detailed and precise terms, it represents a method of allocating an essential natural resource in times of supply crises according to a Congressionally-mandated system of priorities. Implicitly underlying the selection of certain users for high or essential priority status was the realization that other natural gas users would potentially be denied a supply of natural gas which would limit or suspend their operations. The NGPA, in other words, does not represent an ideal allocation of natural gas, nor is it a continuing one, since it operates only in times of curtailments. Rather, it represents an attempt to use a resource during a time of scarcity to further the national well being, as identified and defined by Congress. Given the fact that, including individual households, there are literally millions of natural gas customers, the approach had to be not only as equitable as possible, but also a manageable method of deciding where natural gas should be shuttled in times of shortage.
 
 
 121
 A further observation of this statutory scheme demonstrates that, given the enormous numbers of users, "bright line" tests were necessary to segregate the various classes of entitlements. Because this system of priorities operates only in periods of shortages, the mechanism is not continuously operative, making compliance difficult for those users who fall into gray areas of priorities. The statute itself addresses the high priority users with sharp definition. And while precise terms are not employed to address the question of what constitutes "full food and fiber production," we find no abuse of discretion by the Secretary of Agriculture in electing to define it as current production.
 
 
 122
 This definition has the advantage, operationally, of not requiring a mammoth assessment of historical usage. While this alone is not sufficient to compel the result we reach, it provides a guidepost to the purpose of the operative language chosen. Congress expressed a concern regarding the administrative burden in implementing the NGPA's demands. These demands would be magnified by use of a historically based approach to defining full food and fiber production. Taken alone, the Congressional concern with the simple administrative burden of defining and applying an allocation suggests that a historically based approach was not indicated. Taken collectively with the other factors we identify, it leads to the result expressed in this opinion regarding the definition of "full food and fiber production."
 
 
 123
 If USDA had not selected 100% of current requirements as the benchmark for full food and fiber production, any curtailment would have a deleterious impact on food and fiber producers and processors. Indeed, it was Congressional awareness of the effects of gas interruptions on agriculture and food and fiber industries that led to the elevation of those users above all but the highest priority users: residences; small commercial users; educational and health institutions; and users whose curtailment would "endanger life, health, or maintenance of physical property." NGPA Sec. 401(f)(2)(D). The selection of these users, and the amplification by the Secretaries, did not signal an insensitivity to the needs, or the importance, of other users. Rather, it was a first attempt to ration an important natural resource in times of supply curtailments. As this is a first effort at legislatively establishing allocation priorities, it may well be legislatively amended if experience with allocations require adjustments. Similar adjustments may be made, within the bounds of their discretion, by the Secretaries. However, we do not find these regulations allowing agricultural users to obtain 100% of current requirements of natural gas to be an abuse of discretion. Consequently, we affirm the certification.
 
 
 124
 2. Implementation of the Secretary's Certification by the Federal Energy Regulatory Commission**
 
 
 125
 In implementing the essential agricultural use priority, FERC took the view that section 401 of the NGPA requires the pipelines to serve the volumes certified by USDA, provided that the volumes do not exceed limits imposed by contract or certificate. The "Agricultural Petitioners and Supporting Intervenors" claim the essential agricultural users should have received more; various consumer, pipeline, and distribution company interests claim they should receive less.
 
 
 126
 The agricultural users' argument is most easily disposed of because logically it falls of its own weight. Because the NGPA operates only in periods of shortages of natural gas which result in curtailment of deliveries to users, the priority scheme established by the NGPA is inoperative in times of normal availability of natural gas. If accepted, the option urged by the agricultural users--that they be entitled to receive 100% of their demand free of certificate or contract limitations--would permit them in the times of shortages to receive more gas than during ordinary periods of operation. Against the backdrop of the NGPA, this would mean that in a supply crises, during which it is imperative that supplies be most wisely conserved and allocated on a priority basis, agricultural users could receive more gas than during normal supply periods. We find nothing in the statute or the legislative history which compels that paradoxical result. The purpose of a certificate or contract limitation is to permit both supplier and purchaser or user to identify the maximum amount of natural gas which will be delivered to the user. Collectively, these limitations establish a ceiling on the gas use by the larger natural gas users of a particular pipeline. This information is essential to the process of estimating the demand for natural gas.
 
 
 127
 If the argument urged by the agricultural users were to prevail, it would undo these reasonable supply-demand expectations at a time when the pipeline is incapable of meeting expected demand. Additionally, by recognizing contract or certificate limitations as a ceiling on demand, no violence is done to the statutory intent to assure "full food and fiber production." Contract or certificate terms are objective benchmarks of expected demand for natural gas which may be only one of several fuels available to a particular agricultural user. If an agricultural user, through a certificate or contract provision, has been allocated a specific quantity of natural gas, the agricultural user has tailored its operations using gas to the ceiling expressed by that limitation and must perform its operations with that amount of natural gas during normal supply periods. No reason has been demonstrated why in time of acute shortages, sufficient to require curtailment of deliveries, the ceiling which is adequate during periods of normal supply should become inoperative, and be replaced by a right to make unlimited demands on a sharply reduced supply.
 
 
 128
 Thus, although Congress was clearly concerned in regards to agricultural users that shortages of natural gas would have a devastating effect on the cost and availability of food and fiber, there is nothing in either the NGPA or its legislative history to suggest that where the agricultural user is subject to a ceiling on demand during periods of normal operation, the supply restriction should become inoperative by the existence of a supply curtailment.
 
 
 129
 Accordingly, we affirm the use of a certificate or contract provision as a ceiling on the demand for agricultural users.
 
 
 130
 In contrast to the arguments of the Agricultural Petitioners, who contend they should have received more, the industrial petitioners--the Process Gas Consumers Group (Process Gas), United Gas Pipe Line Company (United), and the United Gas Distribution Companies (UDC)--argue that FERC was too generous in determining allowable volumes for essential agricultural users. While FERC noted that the very nature of a "curtailment" plan required the recognition of contract limits, and that the independent statutory structure supporting the issuance of certificates of public convenience and necessity required the recognition of certificate limits, FERC took the view that "it is required by law to accept the USDA certification to the extent that it is applicable to the curtailment plan of an interstate pipeline."[31]
 
 
 131
 The industrial petitioners argue in essence that FERC was empowered to engage in substantive review of USDA's section 401(c) certification. We disagree. Section 401(a) requires issuance of a rule that protects essential agricultural users "to the maximum extent practicable," up to and including "the use requirement specified in subsection (c)," subject only to the needs of "high-priority users." That language, we think, fairly implies that it is the Department of Agriculture, and not FERC, that is authorized to ultimately determine the volumetric requirements of essential agricultural users. FERC reasonably concluded that its function was simply to implement the USDA certification to the extent that it applies to a pipeline's curtailment plan. See generally Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). To the extent petitioners think the USDA certification is overbroad, they have had the opportunity, which they have exercised, of having the USDA rule reviewed separately. (See Part I.A.1 supra.) The availability of such independent review is yet another indication that Congress did not intend to require or authorize FERC to second-guess the Secretary of Agriculture.
 
 
 132
 3. Retention of Base Years for High Priority Users***
 
 
 133
 Petitioners Atlanta Gas Light Company and Consolidated Edison Company of New York challenge FERC's decision to provide for curtailment of essential agricultural use on the basis of 100% of current requirements while retaining a base-year method for calculating curtailment of supply to other uses of natural gas, including high-priority users. Petitioners challenge this action under two theories. First, they argue that the practical effect of the rule is to subvert the statutory priority scheme of section 401 of the Natural Gas Policy Act. Their second argument is that the retention of base-years for high-priority consumers and abolition of base-years for essential agricultural users is undue discrimination under North Carolina v. FERC, supra.
 
 
 134
 Prior to the enactment of the NGPA, the use of base-year periods to calculate curtailment of gas deliveries was the accepted method.[32] Because the Secretary of Agriculture certified 100% of current requirements of certain agricultural users as the essential volume under the Act, FERC was faced with the task of implementing a current requirements quota within a system that normally used a historical figure to set future quotas and curtailments. The Commission chose to abandon the base-year method for calculating curtailment of gas deliveries for essential agricultural uses, determining that abandonment was preferable to some kind of base-year method.[33] The Secretary of Agriculture does not certify the volume of high-priority gas, nor does any other agency. The Commission retained the prior base-year method for implementing curtailment of high-priority gas.
 
 
 135
 Petitioners contend that FERC's action is contrary to the statutory command of section 401 of the NGPA, which provides in relevant part as follows:
 
 
 136
 Not later than 120 days after November 9, 1978, the Secretary of Energy shall prescribe and make effective a rule, which may be amended from time to time, which provides that, notwithstanding any other provision of law (other than subsection (b) of this section) and to the maximum extent practicable, no curtailment plan of an interstate pipeline may provide for curtailment of deliveries of natural gas for any essential agricultural use, unless such curtailment--
 
 
 137
 (1) does not reduce the quantity of natural gas delivered for such use below the use requirement specified in subsection (e) of this section; or
 
 
 138
 (2) is necessary in order to meet the requirements of high-priority users.
 
 
 139
 * * *
 
 
 140
 * * *
 
 
 141
 (1) --For purposes of this section--The term "essential agricultural use", when used with respect to natural gas, means any use of natural gas--
 
 
 142
 (A) for agricultural production, natural fiber productions, natural fiber processing, food processing, food quality maintenance, irrigation pumping, crop drying, or
 
 
 143
 (B) as a process fuel or feedstock in the production of fertilizer, agricultural chemicals, animal feed, or food,
 
 
 144
 which the Secretary of Agriculture determines is necessary for full food and fiber production.
 
 
 145
 (2) The term "high-priority user" means any person who--
 
 
 146
 (A) uses natural gas in a residence;(B) uses natural gas in a commercial establishment in amounts of less than 50 Mcf on a peak day;
 
 
 147
 (C) uses natural gas in any school, hospital, or similar institution; or
 
 
 148
 (D) uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property.
 
 
 149
 15 U.S.C. Sec. 3391(a), (f)(2).
 
 
 150
 Petitioners argue that section 401 requires that high-priority users be given priority over essential agricultural uses in all cases where such priority is practicable. This requirement is plain on the face of the statute: subsection (a)(2) provides that the delivery of natural gas for essential agricultural use shall not be curtailed unless it "is necessary in order to meet the requirements of high-priority users." Further, Congress apparently understood the plain language of section 401 to establish agricultural and food processing uses as second to high-priority uses. See 124 Cong.Rec. 16258 (Sept. 27, 1978) (remarks of Senator Clark and Senator Jackson).
 
 
 151
 FERC contends that its interpretation of the statute, embodied in the rule challenged by petitioners, is the appropriate interpretation.
 
 
 152
 It is the position of the Commission that the measurement of requirements for essential agricultural uses pursuant to one standard and the measurement of requirements for all other end uses pursuant to another standard is a preference mandated by Section 401(c), which gives the Secretary of Agriculture authority to certify the natural gas requirements of essential agricultural uses. The Commission believes that it is required by law to accept that certification to the extent that it is applicable to the curtailment plan of an interstate pipeline. No such provision exists with regard to high-priority users.
 
 
 153
 FERC Order Denying Rehearing (June 20, 1979), J.A. 256-57.
 
 
 154
 The Commission has also stated that: Congress did not mandate ... high-priority load growth. Thus, to the extent that load growth is required by the USDA rule and the agricultural users (or its local distributor) has [sic] the requisite contractual authority, it is the Commission's view that Congress intended that agricultural load growth be permitted.
 
 
 155
 Order No. 29, 44 Fed.Reg. 26857, J.A. 316.
 
 
 156
 FERC has interpreted the statute as requiring it to accept the Secretary of Agriculture's certification of 100% of current requirements. With this we agree.[34] This will allow agricultural load growth. We also agree with the Commission when it says that section 401 does not mandate high-priority load growth. However, there is a logical difference between stating that Congress did not mandate such growth and stating that Congress would allow high-priority load growth to have priority, just as it would permit agricultural use to have its priority. The Commission has not explained why Congress would allow only the secondary priority of gas use to expand.
 
 
 157
 FERC also relies on a passage from a Conference Committee Report which is part of the legislative history of section 401. The passage states:
 
 
 158
 For purposes of implementing the section, the Commission is instructed to reopen curtailment plans that are already in effect under the Natural Gas Act only to the extent necessary to ... bring them into conformity with the new curtailment priority schedule. The conferees were concerned that these changes not burden the Commission with lengthy proceedings which might throw existing curtailment plans into disarray. Therefore, the conference agreement includes the term "to the maximum extent practicable" to assure that the Commission has the necessary flexibility in implementing any changes.... [T]he conferees do not intend the reopening of curtailment plans for this limited purpose to result in adoption of a new base year for curtailment purposes.
 
 
 159
 H.R.Rep. No. 95-1752, 95th Cong., 2d Sess. 113 (1978), U.S.Code Cong. & Admin.News 1978, p. 9029.
 
 
 160
 FERC argues that this passage justifies not reopening interstate pipeline curtailment plans which rely on base-years for high-priority users while reopening such plans for essential agricultural users.[35] The Commission is arguing, in effect, that Congress intended to excuse the Commission from reopening curtailment plans in order to protect high-priority users, but required reopening for essential agricultural uses, the second priority. This is inconsistent with the plain language of section 401 and common sense. The Conference Committee Report simply states that the Commission is to have some flexibility in implementing the priority schedule of section 401. It does not provide support for reversing the statutory priorities by the use of base years to the prejudice of high-priority users, while protecting agricultural users by applying a current requirements method.[36]
 
 
 161
 The rule finally adopted by FERC retains the base-year method for high-priority gas while abandoning base years for essential agricultural gas. Assuming growth in demand in both classes of consumers, the inevitable result of this dichotomy will be that high-priority gas delivery will be curtailed before the essential agricultural gas delivery. This result is easily seen by comparing the position of a newly installed gas burner in a home with the position of a newly installed gas burner in a food processing plant. The residential heater is a high-priority user under NGPA section 401(f)(2)(A). The burner in the food processing plant is an essential agricultural user under section 401(f)(1)(A). The new burner in the residential building will not be given priority in times of shortage because its volumetric demand will not be reflected in the historical base-year. The new food processing burner will be accorded 100% of its needs because its current requirements are reflected in any plan filed by the interstate pipeline that supplies it directly or indirectly.
 
 
 162
 Assuming growth in demand, the impact of shortages and curtailments will be felt by gas companies that have new high-priority customers before it is felt by gas companies with new essential agricultural customers. Of course, any gas distribution company is likely to have a mix of customers. Nevertheless, the implementation of the Commission's rule will curtail deliveries for high-priority users before curtailing deliveries for essential agricultural users. This does not reflect the statutory scheme.
 
 
 163
 FERC argues that the practical result of a decision requiring similar treatment of high-priority and essential agricultural users will be growth in gas use by high-priority users. The Commission apparently does not favor such growth. This argument leaves the Commission in the untenable position of advocating growth for the second priority consumer class alone while the statutory section at issue requires that the second class of consumers be cut off from gas supplies before the primary class. It would turn the statutory scheme of priorities up side down to allow growth in a lower priority while discouraging it in the primary (high-priority) sector of the economy.
 
 
 164
 The statute requires FERC to adopt a rule which allows high-priority users of gas to avoid curtailment to the maximum extent practicable. On remand, the Commission will have an opportunity to draft a rule that does not in practice reverse the statutory scheme of section 401.[37]
 
 
 165
 B. Defining the Scope of the Priority Classifications
 
 
 166
 1. Manufacture of Pharmaceuticals and Medical Devices
 
 
 167
 Eli Lilly and Company ("Lilly"), a pharmaceutical and medical device manufacturer,[38] contends that not according drug companies status as a high priority user is inconsistent with the requirements of the NGPA. Lilly argues that the interruption of natural gas supplies could have a devastating effect on the production of essential pharmaceutical products and medical devices. Lilly Br. at 2. At the Commission level, Lilly supplemented its public presentation with confidential supporting materials produced under seal.[39] After a full review of the record, we disagree that Lilly is entitled to classification as high priority user.
 
 
 168
 Lilly requests a blanket high priority status for itself, a status which, if granted, would allow access to natural gas segregated neither on the basis of essential products nor on the basis of those manufacturing processes of essential products which would be devastated by the interruption of gas supplies. And while Lilly portrays the interruption of its manufacturing processes as having a paralyzing affect on the availability of vital pharmaceutical supplies, the materials which it has used to buttress that contention do not support the breadth of the requested exception. We may well agree that the manufacture of a vital drug with a short shelf life is sufficiently essential under the NGPA to justify high priority status, but that is not the case which Lilly presents.
 
 
 169
 Rather Lilly argues for a company and industry-wide priority on the basis of the need to maintain production of products undifferentiated on the basis of their importance in the maintenance of the national health and welfare. Lilly itself is a large pharmaceutical and medical devices manufacturer with over 600 products. J.A. 496. Presumably within its diversified product line, continued manufacture of some products is more essential to the nation than others, either because of the medical application for which they are intended, or because of the nature of the manufacturing process, or the shelf life of the product. Lilly's failure to demonstrate more than the obvious fact[40] that pharmaceuticals and medical devices are more essential than some other items of manufacture does not address the question of the essential nature of gas supplies to the pharmaceutical manufacturers under the NGPA.
 
 
 170
 Consequently we find nothing in the record to justify Lilly's plea for special consideration and affirm the Commission's treatment of pharmaceutical manufacturers.[41]
 
 
 171
 2. The Alternate Fuel Test for Certain High-Priority Users
 
 
 172
 In its proposed rules the ERA (see p. 1332 supra) sought to exclude apartment houses, schools, hospitals and similar institutions from the definition of "high priority user" if they had "existing alternate fuel (excluding solar energy) capability in place [or] access to adequate supplies of alternative fuel." 43 Fed.Reg. 54,663 (1978). The agency indicated some doubts as to whether the alternate fuel test was proper, however:
 
 
 173
 This exclusion of apartment buildings, schools and hospitals having alternate fuel capability is not explicit in the NGPA, but is consistent with Congress' expressed intent to include in the high priority category only those uses essential to protection of life, health, and physical property, and is also consistent with Congress' priority treatment of essential agricultural uses, which explicitly excludes uses for which there is alternate fuel capability. We specifically invite your comments on whether this exclusion of apartment houses and other multi-unit buildings and schools and hospitals with existing alternate fuel capabilities and access to adequate supplies of those fuels from the definition of high priority users should be changed.
 
 
 174
 Id., at 54,661.
 
 
 175
 A majority of the comments received opposed this alternate fuel requirement, and the final rule eliminated it, providing that any person using natural gas in a residence or in any school or hospital is a high-priority user. 10 C.F.R. Sec. 580.02(6) (1980). The agency concluded that "in the absence of more explicit statutory support for an alternate fuel test for high priority users, it should be eliminated from the final rule." 44 Fed.Reg. 15,644 (1979).
 
 
 176
 The Process Gas Consumers Group (Process Gas) challenges the agency's refusal to include the proposed alternate fuel test in the final rule. It argues that the NGPA establishes the highest priority only for natural gas which is "necessary in order to meet the requirements of high-priority users", 15 U.S.C. Secs. 3391(a)(2), 3392(a)(2) (emphasis added), and that natural gas is never "necessary" to meet the needs of persons who are capable of using an alternate fuel. Process Gas therefore concludes that ERA erroneously decided that it lacked statutory authority to impose the alternate fuel requirement.
 
 
 177
 ERA argues that if Congress had intended to impose an alternate fuel requirement upon any high-priority users, it would have done so explicitly. We agree. Congress did impose such a requirement upon the other uses to which it gave priority--essential agricultural users, 15 U.S.C. Sec. 3391(b), and essential process or feedstock uses, 15 U.S.C. Sec. 3392(b).
 
 
 178
 Such explicit language does not appear with respect to high-priority users, however. If Congress had intended to treat all three priority categories established by the NGPA equally by imposing an alternate fuel test upon each of them, we find it difficult to believe that it would have explicitly imposed such a requirement upon two of the categories, but failed to do so for the third.
 
 
 179
 Petitioners turn to the legislative history to support their argument. They rely upon the discussion of the definition of high-priority user in the NGPA Conference Report, H.R.Rep.No. 1752, 95th Cong., 2d Sess. 113 (1978), U.S. Code Cong. & Admin. News 1978, p. 9030:The conference agreement includes the House definition of "high priority use" modified to include schools, hospitals, and any other similar institutions for which the Secretary [of Energy] determines that curtailment of natural gas supplies would endanger life, health, welfare, or maintenance of physical property.
 
 
 180
 Petitioners argue that this passage indicates that schools, hospitals and similar institutions[42] should be considered high-priority users only if the Secretary determines that curtailment of gas service to them would endanger life or health and that the Secretary must take the availability of alternate fuels into account in making this determination. The Conference Report cannot modify the plain language of the statute, however. See National Small Shipments Traffic Conference v. CAB, 618 F.2d 819, 831-32 (D.C.Cir.1980). The statutory language does not support petitioners' contentions. NGPA section 401(f)(2) provides:
 
 
 181
 The term "high-priority user" means any person who--
 
 
 182
 * * *
 
 
 183
 * * *
 
 
 184
 (C) uses natural gas in any school, hospital or similar institution; or
 
 
 185
 (D) uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property.
 
 
 186
 15 U.S.C. Sec. 3391(f)(2) (emphasis added). The Conference Report is insufficient to override this clear language which indicates that any school, hospital, or similar institution is a high priority user, with no reference to an alternate fuel test, and that other uses are eligible for high priority treatment if the Secretary determines that curtailment of gas deliveries to them would threaten life, health or property.
 
 
 187
 Petitioners contend that the agency placed undue reliance upon comments submitted by Senators Jackson and Ford in reaching its decision on this issue. While such post-passage comments are not part of the legislative history, ERA was certainly entitled to consider them and to adopt views expressed by the Senators if it found them persuasive. We find no indication that ERA gave the Senator's comments undue weight, and we note that others who submitted comments on this issue expressed the same view as the Senators.[43] We therefore find no reversible error due to ERA's consideration of these comments.
 
 3. The Treatment of Storage Gas
 
 188
 The treatment of storage gas, since it is not an "end use" itself, has been a problem ever since the initiation of curtailment based on end use.[44] The supply of gas is fairly steady throughout the year, while demand tends to be seasonal; therefore, many distributors have invested in substantial storage facilities, which are filled during the summer and tapped during the winter. In the curtailment plans now in effect for the individual pipelines, gas delivered for storage was classified either in a specific priority (usually former Priority 2)[45] or allocated among the priorities depending upon how the gas was actually used during the winter. This allocation method has been dubbed "sprinkling." Both methods may have practical problems in implementation, and, according to the Department of Energy (DOE), the "proper priority treatment of storage injection volumes is an issue in our long term review of natural gas curtailment priorities."
 
 
 189
 In its implementation of DOE's rules under the NGPA, FERC declared that it intended, insofar as it was possible, to maintain the status quo on the treatment of storage gas.[46] Those pipelines which "sprinkled" their storage gas would continue to do so, while those pipelines which assigned storage gas to a particular priority would also continue to do so. The only change resulted from the redefinition of Priority 1 uses, and the insertion of essential agricultural uses into the particular plan as Priority 2 pursuant to the NGPA, bumping the other priorities (including storage injections) down a step.
 
 
 190
 A number of petitioners challenged this treatment of storage gas, arguing that in order to adequately protect high-priority, temperature-sensitive consumers, FERC should either mandate sprinkling on all pipelines, or include storage gas in Priority 1 or 2. Some argued that FERC's final rule did not implement, and in fact was inconsistent with, DOE's rule concerning storage. These arguments, rejected by FERC, have been raised here again on review.
 
 
 191
 Our review of FERC's decision regarding the treatment of storage gas is limited to ascertaining whether that decision is consistent with the NGPA, and to assuring that FERC's treatment of the issue is not arbitrary or capricious. We begin by describing how the storage gas issue was treated in the administrative proceedings following the passage of the NGPA.
 
 
 192
 No mention is made of the proper treatment of storage gas in either the Act itself or the legislative history. Rather, the Act directs DOE to prescribe regulations necessary to protect essential agricultural uses from curtailment except as necessary to protect higher priority uses.[47] It is then FERC's responsibility to implement DOE's rule, through its authority to establish, review and enforce curtailments under the Act.[48]
 
 
 193
 In its proposed rule, which DOE described as "a general rule, binding on all interstate pipeline companies,"[49] DOE did not discuss the proper treatment of storage gas. However, in an example describing how a curtailment plan under its rule would work, storage injection requirements were assigned a priority immediately following essential agricultural uses.[50] If this example were regarded as "binding," the practice adopted by most pipelines of "sprinkling" their storage gas would appear to be outlawed. DOE received many comments, both from the public and from FERC, urging it to make clear that such was not its intent.[51] Some urged DOE to go further, and to mandate storage sprinkling as the most accurate and equitable way to treat storage under curtailment,[52] while others contended that storage gas should be classified as Priority 1 or 2.[53] In its final rule, DOE addressed the storage gas issue:
 
 
 194
 As the FERC and other commenters pointed out, our proposed rule did not address explicitly the manner in which storage injections should be treated in interstate pipeline curtailment plans. The problem is further complicated because the NGPA is silent on this issue. During the consultation process, the FERC recommended that gas injected into storage be given the same treatment under this rule as it is given in interstate pipelines' currently effective curtailment plans, to the extent practicable.
 
 
 195
 Several distribution companies argued that since storage is not an end use but an interim delivery for an end use, the rule should require that the allocations given distributors for storage be in proportion to the actual deliveries made during the storage withdrawal season (winter) to a distributor's customers, an approach referred to as "storage sprinkling". Pipeline companies and others using "block storage" opposed any imposition of "storage sprinkling" where it is not currently included in existing curtailment plans.
 
 
 196
 The proper priority treatment of storage injection volumes is an issue in our long term review of natural gas curtailment priorities. We do not intend at this time to make a final determination on the treatment of such gas. Yet, because of the importance of filling storage during the summer and protecting gas service to high-priority users and essential agricultural uses, we have added Section 580.03(d) to the final rule. This will also fulfill the FERC's desire to maintain some flexibility to deal with this problem on an operational level.
 
 
 197
 44 Fed.Reg. 15645 (1979). Section 580.03(d) provided:
 
 
 198
 (d) Nothing in this rule shall prohibit the injection of natural gas into storage by interstate pipelines or deliveries to its customers for their injection into storage unless it is demonstrated to the Federal Energy Regulatory Commission that these injections or deliveries are not reasonably necessary to meet the requirements of high-priority users of essential agricultural uses.
 
 
 199
 Id. at 15647.
 
 
 200
 At this point it became FERC's responsibility to implement the DOE rule. As it had urged should be the practice in commenting on DOE's rule, FERC's general implementation rule provided that storage injections would continue to be classified in the same manner as in the then effective curtailment plan for each pipeline.[54] The figures would be juggled, because of the insertion into each plan of a new Priority 2 for essential agricultural uses and the redefinition of Priority 1 users, but the pipelines which sprinkled would continue to sprinkle, and those which assigned storage gas a single priority would continue to assign it to the same priority, shifted down to accommodate the new Priority 2.
 
 
 201
 Again there were objections, this time directed to FERC's decision to maintain the status quo on those pipelines which assigned all storage gas to a single priority. The commentators either urged FERC to require all pipelines to sprinkle,[55] or sought reclassification of storage gas to Priority 1 or 2.[56] Some distributors argued that deliveries to high priority customers would not be assured without utilization of storage, and that storage would be discouraged by permitting storage gas, which might ultimately be used to serve Priority 1 or 2 customers, to be categorized as a lower priority. Others contended that placing storage gas in a single priority, when some of it might be used for higher and some for lower priority customers, resulted in an unlawful discrimination among customers in violation of the Act. Finally, some contended that FERC's implementation was inconsistent with DOE's rule 580.03(d), which they interpreted to establish a presumption that storage injections are necessary to meet the requirements of high-priority or essential agricultural users, and thus, by implication, properly classified as Priority 1 or 2.
 
 
 202
 In response to these comments, FERC relied on the directive in the legislative history of the NGPA to the effect that Congress wished the status quo to be disturbed as little as possible in the course of implementing the Act, and curtailment plans altered only to accommodate the new priority for essential agricultural uses.[57] It regarded the following instructions in the Conference Report as clear:
 
 
 203
 [T]he Commission is instructed to reopen curtailment plans that are already in effect under the Natural Gas Act only to the extent necessary to adjust those plans to bring them into conformity with the new curtailment priority schedule. The conferees were concerned that these changes not burden the Commission with lengthy proceedings which might throw existing curtailment plans into disarray. Therefore, the conference agreement includes the term "to the maximum extent practicable" to assure that the Commission has the necessary flexibility in implementing any changes.
 
 
 204
 H.R.Rep.No. 1752, 95th Cong., 2d Sess. 113 (1978), U.S. Code Cong. & Admin. News 1978, p. 9029. The Commission also believed that its decision was fully consistent with DOE's rule, interpreting section 580.03(d) as intended to give FERC flexibility in deciding how storage gas should be handled, not mandating any particular treatment in individual curtailment plans. The Commission did point out that its decision not to alter the status quo as to storage gas does not freeze curtailment plans for all time; pipelines are free to file for reclassification in order to implement sprinkling, and pipeline customers who believe that the curtailment plan under which they are operating is inequitable or results in discrimination among customers can initiate individual proceedings challenging the particular plan.
 
 
 205
 After consideration of the arguments of the parties, and an examination of the record, we conclude that FERC acted well within its discretion and in accordance with the NGPA in the course it selected. The appropriate treatment of storage gas is indeed a perplexing problem during periods of curtailment, and it appears that there may be some degree of inequity no matter what method is chosen, depending on the individual characteristics of each pipeline and the customers it serves. We cannot fault FERC for refusing at this time to impose a single method on all pipelines, especially since the treatment of storage gas in effect in each individual curtailment plan was selected in the course of individual proceedings in which the pipeline and its customers participated.
 
 
 206
 Nor do we believe that the NGPA and the rule adopted by DOE require any particular treatment of storage gas. It would be anomalous indeed to interpret a statute which makes no mention whatsoever of the proper curtailment treatment of storage gas, passed by a Congress which made explicit its concern that curtailment plans be disturbed as little as possible by implementation of the Act, to mandate a fundamental change in FERC's policy of treating the storage gas issue on a case-by-case basis. Furthermore, we think it plain that in promulgating section 580.03(d) DOE was making express its intention not to interfere with FERC treatment of storage gas. Its comments on the rule make this clear, when it stated that "FERC recommended that gas injected into storage be given the same treatment under this rule as it is given in interstate pipelines' currently effective curtailment plans, to the extent practicable .... [Our final rule will] fulfill the FERC's desire to maintain some flexibility to deal with this problem on an operational level." 44 Fed.Reg. 15645 (1979).
 
 
 207
 The petitioners argue nevertheless that the Act is designed to protect deliveries to high priority customers, and that in practical effect the intent of the NGPA will be violated because these customers will not be protected unless storage gas is accorded an equally high priority. To support this broad generalization they assert that much of the gas delivered to high priority customers in the winter is taken from storage,[58] and presumably infer therefrom that were storage not encouraged, there would be insufficient gas to serve high priority customers. We may offer an equally general assertion in response that it seems intuitively that storage gas is normally used to serve lower priority customers, since high priority customers are served first and storage gas would be used to supplement deliveries when insufficient gas is available to serve those further down the line. See City of Wilcox v. FPC, 567 F.2d 394 (D.C.Cir. 1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). We suspect that neither generalization accurately reflects the facts in all cases, and we agree with FERC's initial position before DOE that this difficult problem "should depend on case-by-case evaluations of the end uses, as is currently the practice." FERC Analysis & Recommendations, J.A. 66-67. We note that none of the complaining petitioners offer evidence that they will actually be unable to serve high priority customers if storage gas continues to be ranked as it is in present curtailment plans, and further note that procedures exist whereby a "case-by-case evaluation" of the treatment of storage gas may be initiated by either the pipeline or its customers.
 
 
 208
 Petitioners are in fact attempting to utilize the FERC's implementation of the NGPA as an opportunity to force a complete reexamination of the storage gas issue, an issue which has already been examined (and frequently litigated) in the course of adoption of individual curtailment plans, and which is already under reexamination by the DOE.[59] We do not believe Congress intended the limited reopening of curtailment plans necessitated by the passage of the NGPA to be put to this purpose, and FERC acted reasonably in deciding to confine its actions at this time to the immediate task at hand of amending curtailment plans only to the extent necessary to accommodate the new definitions of priority users.
 
 4. Plant Protection Gas
 
 209
 The NGPA's definition of high-priority user includes any person who "uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property." NGPA Sec. 401(f)(2)(D), 15 U.S.C. Sec. 3391(f)(2)(D). ERA, acting for DOE, has exercised the authority granted by this section to include the use of gas "[f]or minimum plant protection when operations are shut down" as a high priority use. 10 C.F.R. Sec. 580.02(b)(6)(iv) (1980). "Plant protection gas" is gas used to protect life or health of personnel in industrial plants and property located there. Some specific examples of plant protection uses are the prevention of equipment freeze-ups and chemical explosions, preservation of produced goods and work in progress, and maintenance of water safety through the elimination of dangerous airborne substances from the plant's atmosphere. It is clear that Congress intended use of gas for plant protection to be a high priority use. See NGPA Conference Report at 113 ("maintenance of physical property includes protection of plant property"). The question presented to us by the Process Gas Consumers Group and by United Gas Pipe Line Company is whether ERA acted arbitrarily and capriciously in treating only plant protection gas for plants that are closed as a high-priority use.
 
 
 210
 Petitioners argue that natural gas is often necessary to protect health and property in plants that are operating, and that nothing in the language or legislative history of the NGPA indicates that Congress intended to limit plant protection gas to closed plants. ERA explained its decision by stating that "natural gas requirements for industrial plant operations may properly be considered as process and feedstock use, which Congress has determined will be protected after essential agricultural uses. The high-priority designation of plant-protection gas is intended to provide gas not for plant operations, but only when operations are shut down and gas is required to prevent damage to the physical plant." 44 Fed.Reg. at 15645.
 
 
 211
 The decision does not explain why all gas delivered to operating plants "may properly be considered as process and feedstock use." We note that FERC defined the terms "plant protection gas", "feedstock gas" and "process gas" separately in the rules setting curtailment priorities which it promulgated prior to the passage of the NGPA. See 18 C.F.R. Sec. 2.78(c)(6), (7) (1980). As noted above, plant protection gas is used to protect the health of workers and to prevent damage to property in the plant. This use is distinct from process use, i. e., use as a fuel in a manufacturing process, and from feedstock use, i. e., use of gas as a raw material. We can perceive no basis for excluding plant protection gas for operating plants from the definition of high-priority use on the ground that it is actually gas used as a process fuel or as a feedstock.
 
 
 212
 We recognize that natural gas cannot be earmarked for a particular use when it is delivered to an industrial plant, and that gas intended for plant protection use could be used as a process fuel or as a feedstock. It may well be that giving the highest priority only to plant protection gas for non-operating plants is a reasonable means of insuring that manufacturers do not divert gas intended for plant protection process or feedstock use during curtailment. Since ERA's decision does not discuss this possibility we cannot uphold the rule on this ground. We note that the Process Gas Consumers Group's comments suggested that this problem could be solved by giving highest priority to plant protection gas for operating plants only when no other natural gas is being used for production purposes. J.A. at 629. ERA never responded to this comment but the agency is free to explore the matter on remand.
 
 
 213
 We believe that the agency acted arbitrarily and capriciously in treating plant protection gas for operating plants as process or feedstock gas. We therefore remand the case to ERA for further proceedings consistent with this section of the opinion.
 
 5. Offshore Gas
 
 214
 In Order No. 27[60] FERC set forth rules governing the use of pipelines to transport natural gas purchased not by the pipeline itself but by certain classes of ultimate consumers. Such purchases are known as "direct sales."[61] FERC authority to certify transportation of direct sales can now be found in the express provisions of section 608 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 15 U.S.C. Sec. 717f(c)(2).[62]
 
 
 215
 First Mississippi Corporation (First Mississippi) challenges Order No. 27 on two grounds: first, because it excludes from the direct sales program gas produced on the outer continental shelf (OCS gas); and second, because it limits the duration of most direct sale contracts to five years. We find that in the respects in which it is challenged here Order No. 27 represents a reasoned exercise of FERC's discretion and accordingly affirm the Commission.
 
 
 216
 We find no merit at all in First Mississippi's contention that FERC's five-year limit on contract terms is unreasonably brief.[63] In proposing a five-year term for the classes of eligible users governed by Order No. 27, the Commission was reacting to criticism of the two-year term governing its earlier direct sales program.[64] Some had suggested that a two-year commitment provided insufficient incentive to the development or opening of new sources of gas supply for those customers who might qualify for direct sales.[65] Commenters in this proceeding noted, for example, that agricultural plant expansion may depend on assurances that the necessary gas supplies will be available and further suggested that a five-year contract term would not provide the assurance necessary to finance large new capital expenditures.[66] Although acknowledging in its proposed rule the legitimate need of some users for contract terms longer than two years, FERC was also concerned in proposing Order No. 27 that direct sales contracts do not by their duration jeopardize the public interest.[67] The Commission noted in its proposal that "a number of optimistic supply projections have recently been put forward,"[68] and evidently relied on these projections and its five-year duration rule to minimize the risk to the public interest by direct sales contracts during this "evident period of transition and uncertainty."[69]
 
 
 217
 Those who commented on the proposal were divided, some urging a longer term[70] and others arguing for a shorter term if the proposal were adopted at all.[71]
 
 
 218
 We cannot find that FERC acted unreasonably in refusing to extend the permitted term of direct sales contracts beyond the five-year period originally proposed or in failing as an original matter to propose a term longer than five years. Within the context of the program it adopted, the balance of such competing considerations is one best left to the Commission.[72] The record in this case demonstrates that the Commission examined and evaluated those considerations and we will not disturb its decision on the basis of the grounds here advanced.
 
 
 219
 First Mississippi argues that Order No. 27's exclusion of OCS gas represents a fundamental departure from a major purpose of the NGPA--to create a unitary market for all purchasers of natural gas.[73] It is true that through the NGPA Congress intended to merge a badly bifurcated market. Before the NGPA was enacted, intrastate sales were not governed by federal law; the existence of this unregulated intrastate market had enabled sources of gas supply to favor local purchasers willing to pay unregulated prices over interstate pipelines whose offers were not price-competitive.
 
 
 220
 When gas supplies were short, as they were during the several years preceding enactment of the NGPA, this dual market had operated to curtail severely the gas supplies available to interstate pipelines, effectively forcing pipeline customers to shoulder a very large share of the burden of shortage and creating hardship in certain areas of the country.[74] Merging the markets restored the interstate pipelines' ability to compete for short supplies. It was the special hardship experienced by interstate pipelines and their customers which the NGPA's market merger was designed to rectify. From this perspective a rule which effectively preserves to pipelines certain categories of supply does not seem at odds with the purposes of the NGPA.
 
 
 221
 OCS gas has been excluded from direct sales since the program's inception in Order No. 533.[75] Congress, in ratifying the Commission's exercise of authority over the certification of direct sales, gave no express indication that it intended a change in policy in this respect.[76] First, Mississippi, however, argues that section 315 of the NGPA[77] implicitly evinces such an intent. That section affords interstate pipelines a right of first refusal and an option to match any offer to purchase certain natural gas "committed to or dedicated to interstate commerce."[78] Two categories of natural gas are "committed to or dedicated to interstate commerce" under the NGPA: the first includes gas purchased from a well which sold in interstate commerce before a certain date[79] and the other includes all OCS gas not included in the first category.[80] The NGPA's first refusal and option provision covers only the first category of gas (that included by reason of its prior interstate sale); the advantages afforded interstate pipelines by the first refusal and option provision were not extended to OCS gas.[81] First Mississippi argues that this limitation of the first refusal and option provision manifests an intent to make the second category of gas (OCS gas not previously committed by prior sale) equally available to all.[82] Indeed, during debate on the conference substitute the question was quite plainly put on the floor of the House, two conferees asserting that the Act would not affect the Commission's then-existing policies concerning the exclusive use of OCS gas for interstate purposes and one conferee disputing those assertions as an effort to make legislative history.[83]
 
 
 222
 We do not think either the first refusal limitations of the NGPA or the snatch of debate concerning its implications with respect to OCS gas manifest an intent to require FERC to exercise its transportation certification authority differently than it had in the past. It is not clear that the Congress expressly approved the Commission's policies concerning OCS gas but neither is it clear that by extending only limited competitive advantages to interstate pipelines through section 315 of the NGPA, the Congress meant to preclude the continuation of certain other advantages accruing to such pipelines through preexisting Commission policy.[84]
 
 
 223
 Direct sale authority was originally asserted by the Commission[85] and approved by this court[86] as a stop-gap measure necessary to improve the competitive position of interstate pipeline customers in a badly-fractured market. Flexibility was and is the hallmark of the Commission's direct sale authority; it was originally and remains supplemental and discretionary[87]--a means of fine-tuning and adjusting the various problems which may arise during implementation of the Congressionally-prescribed market structure for the sale of natural gas. Direct sale authority must of course be employed in the public interest[88] and should not be used in a manner which defeats or subverts the statutory structure adopted by Congress or which creates perverse analogs to the very problems which underlay Congressional action in 1978.
 
 
 224
 Since the problems which prompted FERC first to authorize direct sales have been substantially reduced by the NGPA, the purposes which Order No. 27 are designed to serve are quite different. As explained by the Commission, a major problem confronting it in the wake of the NGPA's enactment was how to reconcile the NGPA's priority for essential agricultural users with the "clear Congressional intent to minimize the extent to which present curtailment plans will need to be reformulated to implement [the NGPA's priorities]":[89]
 
 
 225
 Commentators in some of the rulemakings pursuant to section 401 of the NGPA have contended that the term "full food and fiber" requires the modification of existing curtailment plans to accommodate both new loads of existing customers as well as new customers. Other commentators have asserted that interpreting section 401 to include load growth would almost certainly require that the base period data of every affected plan be revised, in direct contravention of the instructions by Congress to avoid disruptive changes to the base periods of curtailment plans.[90]
 
 
 226
 The Commission's answer, in part, was to provide for load growth for agricultural and certain other high priority users through direct sales. FERC also intended to allow agricultural users capable of using alternate fuels to use direct sale gas instead.[91] Whether because it was thought necessary to achieve the NGPA's objectives, or otherwise, however, the direct sales program implemented by Order No. 27 operates entirely outside the framework of curtailment priorities.[92] Thus, when supplies are short, direct sales purchasers may not be affected when other pipeline customers will. Given this structure of the program, it was entirely reasonable for the Commission to adopt a limitation on the gas available for direct sales, at least until a clearer picture of supply patterns emerged following enactment of the NGPA.[93]
 
 
 227
 OCS gas was a natural choice for exclusion since to date it has been sold almost exclusively to interstate pipelines.[94] Eligible users under the program should not be disserved by this limitation unless supplies of onshore gas are short when OCS gas is more abundant or unless they cannot for some other reason obtain access to onshore gas when they have or can obtain access to OCS gas. In such cases Order No. 27 permits an eligible user to apply for a waiver of the program's limitations.[95]
 
 
 228
 First Mississippi argues that a waiver would be impossible to obtain as a practical matter, first, because no producer would commit itself to sell in the face of a regulatory prohibition and, second, because as it reads the order no waiver will be granted without a commitment from the producer. FERC answers that Order No. 27 does not expressly require a signed commitment by the producer and that the details for securing a waiver remain to be fashioned.[96] We assume that the Commission will not require a formal commitment on the part of the seller before approving a waiver application under its direct sale program and that the program itself will be employed to make reasonable adjustments within the framework of the Act.
 
 
 229
 Whether those high priority agricultural users eligible for participation in the direct sale program whose interests First Mississippi vigorously argues are not adequately or fairly served by Order No. 27 will in fact suffer the kinds of hardship which the NGPA or the NGA were designed to prevent cannot yet be determined but must await examination in light of the program's implementation and the administration of the NGPA.
 
 
 230
 Except in the respects it is here challenged we intimate no views on the propriety, reasonability or wisdom of the direct sale program implemented by Order No. 27. First Mississippi challenges the program only insofar as it excludes OCS gas and limits contract terms to five years. We find neither the OCS exclusion nor the five year limitation unlawful or unreasonable and accordingly affirm the Commission.
 
 III. PROCEDURAL CHALLENGES
 A. Environmental Impact Statement
 
 231
 Process Gas Consumers Group (Process Gas) also attacks the final economic and environmental impact statement (FEEIS) filed by the Secretary of Agriculture, asserting it is deficient on four grounds. As the statement of those grounds will make evident, the attack is not on the adequacy of the FEEIS; rather, it is a backhand effort to obtain duplicative review of the USDA regulations in their allocation of natural gas, rather than in their impact on the environment.
 
 
 232
 USDA acknowledges that the National Environmental Protection Act (NEPA), 42 U.S.C. Sec. 4332(2)(C), is applicable to the allocation regulations; an FEEIS was filed which USDA contends is adequate against the charges made by Process Gas. We agree.
 
 
 233
 Process Gas mounts four specific attacks on the regulations, under environmental grounds. Process Gas' brief states those grounds as follows:
 
 
 234
 Four obvious alternatives were ignored. First, the FEEIS refused to consider the important alternative advocated by PGC. Under PGC's alternative, USDA would omit from its certification new agricultural uses and uses for which natural gas is not "necessary" (i. e., those agricultural uses which possess installed dual fuel capability). This alternative would assume adherence to fixed base periods, and is the one which, PGC submits, is most consistent with Section 401. Yet, by refusing even to consider it (or even one like it), the USDA is left without any idea of the relative impacts of such an approach on full food and fiber production, on other gas consumers, or on the public as a whole.
 
 
 235
 Second, the FEEIS omitted the alternative of continued implementation of the USDA's Interim Rule. The USDA explained its decision to omit this obvious alternative by stating:
 
 
 236
 "It was recognized that alternative 4 and the Analysis Case [the Interim Rule] in the Draft EEIS would be realized only as a result of any action taken at the discretion of FERC and analysis of impacts of such action would be speculative. Therefore, these two options have been eliminated from any further consideration in the USDA Final EEIS." (FEEIS at 3 (AR. 2672) (emphasis added)).
 
 
 237
 Yet, the whole point of the impact analysis is to elucidate the relative costs and benefits of all alternatives, including those which are not adopted. This is especially important here since USDA acted as the "lead agency" in preparing an EIS with respect to the implementation of Section 401, and other agencies, particularly the FERC, did not prepare one.
 
 
 238
 Third, despite the clear indication that Congress did not intend USDA to have authority to certify new uses or to cause revisions in base periods, the USDA failed to consider any alternative under which base periods would be retained and the requirements of new agricultural uses would be omitted from the certification.
 
 
 239
 Fourth, the USDA failed to consider the alternative of retaining the status quo. Although this "no action" alternative would require legislative action, it would be important to establishing a "base case" for comparing and assessing the relative impacts of the lawful alternatives before the USDA.
 
 
 240
 Process Gas Br. at 65-66 (textual emphasis generally added).
 
 
 241
 An initial examination of these allegations makes clear a threshold consideration: they relate to the basic issues presented in this case regarding allocation of gas supplies rather than environmental considerations. That is not an environmental question as such, although it has environmental aspects. Rather, it is a question which is resolved by recourse to the NGPA.
 
 
 242
 In its third contention Process Gas argues that USDA failed to consider the alternative of retaining the status quo. That is not accurate. USDA was not dealing with the environmental considerations from step one. Rather, there was a direct Congressional mandate to follow in formulating the regulations. As we have decided that the use of base periods was not required under the express command of the applicable statute, but rather use of current demand, as limited by contract or tariff provisions. We find nothing in the NGPA which requires the use of base periods to be rejected on environmental grounds.
 
 
 243
 The range of alternatives need not extend beyond these reasonably related to the purposes of the project. Trout Unlimited v. Morton, 509 F.2d 1276, 1286 (9th Cir. 1974). The purpose of judicial review of an environmental impact statement is to require a "hard look" by the responsible agency at the alternatives to the project in light of the environmental consequences. Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 839 (D.C.Cir.1972). The nature of the environmental statement must also be assessed in the context of the federal action being taken. Aberdeen & Rockfish R. Co. v. SCRAP, 422 U.S. 289, 322, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1974). Judicial review must also be mindful of the Supreme Court's admonition that the "fundamental policy questions appropriately resolved in the Congress and in the state legislatures are not subject to reexamination in the federal courts under the guise of judicial review of agency action." Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1977) (emphasis in original). That same case emphasizes that the goals of NEPA essentially set out procedural mandates to the agencies. That mandate was met here.
 
 
 244
 B. Separate Implementation of Section 401(b)
 
 
 245
 Several petitioners[97] have challenged FERC's piecemeal implementation of the curtailment priorities for essential agricultural uses set forth in section 401 of the NGPA. At issue here is the Commission's decision to conduct separate rulemaking proceedings to implement section 401(b) of the NGPA. We find no error in the approach adopted by the Commission and accordingly reject this attack upon the rulemaking proceedings before us in this case.
 
 
 246
 Section 401(b) of the NGPA provides that the statutorily-mandated curtailment preference for essential agricultural uses will not apply "[i]f the Commission, in consultation with the Secretary of Agriculture, determines, by rule or order, that use of a fuel (other than natural gas) is economically practicable and that the fuel is reasonably available as an alternative for any agricultural use of natural gas."[98] Although the Commission originally proposed to define alternate fuel capability in a single rulemaking proceeding implementing other aspects of the new curtailment priorities set forth in section 401 of the NGPA,[99] the Commission decided when its final order was entered to consider and resolve the alternate fuel issues independently.[100] Accordingly, a new notice of proposed rulemaking concerning the NGPA's alternative fuel provision was published contemporaneously with FERC's final order concerning other aspects of section 401. Those separate proceedings have resulted in the issuance of an interim order,[101] effective January 1, 1980, as to which rehearing was denied February 19, 1980,[102] and are the subject of a separate petition for judicial review, currently pending in this court.[103]
 
 
 247
 Petitioners make a number of arguments with respect to the Commission's decision to carve implementation of the alternative fuel provision out of the rulemaking challenged here.[104] The answer to all these arguments, however, is first, that the Commission had discretion under the NGPA to proceed as it did, even if having done so means that there was some interim period when "curtailed" agricultural uses were not reduced by alternate fuel capability; and second, that the Commission's discretion was exercised reasonably, adequate reasons having been given for the decision separately to consider alternate fuel capability.
 
 
 248
 As we understand the petitioners' contentions, the core issue is whether the NGPA effectively requires FERC simultaneously to implement the curtailment preference for essential agricultural uses set forth in section 401(a) and the alternative fuel provision of section 401(b). For two related reasons we think it does not. First, by setting a 120-day deadline for DOE's rule under section 401(a),[105] Congress was clearly concerned that a new curtailment preference for essential agricultural uses be implemented promptly.[106] However, no comparable concern was expressed with respect to the alternate fuel provision[107] and a decision to proceed in piecemeal fashion is thus supported by the statutory structure.[108] Second, the mandatory language of section 401(a) contrasts with the more discretionary tone of section 401(b) and supports a determination that the implementation of section 401(a) be given priority. We do not mean to imply that the Commission was free to decline consideration of alternate fuel capability; Congress clearly intended that alternate fuel capability be considered.[109] Nor do we mean to imply that the Commission was free unreasonably to delay consideration of alternate fuel capability, but the delay in this instance was not unreasonable.
 
 
 249
 When its final order concerning other aspects of section 401's curtailment priorities was entered, the FERC referred to the contemporaneously issued notice of proposed rulemaking concerning alternate fuel[110] and when an order on rehearing was issued in the original proceedings, a more complete explanation of the decision to proceed separately was supplied:[111]
 
 
 250
 It is the Commission's view that its obligations under the NGPA do not permit any further delay in the final implementation of section 401(a). That section is subject to a statutory deadline. Sections 401(b) and 402 are not. Congress clearly intended that implementation of section 401(a) should be given precedence if similarly expeditious implementation of sections 401(b) and 402 was not possible. Given the different data required for implementing those sections and the need to coordinate rulemaking among the Department of Agriculture (USDA), the Economic Regulatory Administration (ERA), and the Commission, the simultaneous implementation of all sections of Title IV would be impossible without substantial delay of a final rule under section 401(a).
 
 
 251
 In our view this explanation constitutes an adequate statement of reasons for the FERC's decision to proceed with the implementation of other aspects of section 401 while rulemaking continued under section 401(b). Nothing suggests, as one commenter implied,[112] that the Commission was deliberately "creating moving targets"[113] designed to confuse the public or to thwart review. The Commission had discretion to proceed as it did and we cannot say it exercised that discretion unreasonably. We accordingly reject this challenge to these rulemaking proceedings.[114]
 
 CONCLUSION
 
 252
 While we thus generally affirm the agency actions in issue, we hold that the rule must be remanded to FERC insofar as it retains the use of a base-year method for high-priority uses and insofar as it denies high-priority status to plant protection gas used in operating plants.
 
 
 253
 WALD, Circuit Judge, dissenting in part.
 
 
 254
 I concur in the majority's conclusion that the rule challenged here must be remanded to the Commission for revision because it "in practice reverse[s] the statutory scheme of section 401" by favoring new users in the second priority classification over new users in the highest priority classification. However, I disagree with the majority opinion insofar as it adverts that the FERC must resolve this inequitable situation by according both high priority and essential agricultural users entitlement to volumes of natural gas sufficient to meet their current requirements. In my view, no legislative mandate requires the FERC to implement unchanged the Secretary of Agriculture's certification of agricultural users' gas needs; rather, I conclude that the NGPA leaves the FERC the discretion to utilize its expertise to fashion a curtailment rule that accommodates agricultural priority users "to the maximum extent possible" consistent with legislative intent, overall curtailment policies, and administrative practicalities.[1] 1] It should be given the opportunity to utilize the full extent of this discretion on remand.
 
 I. THE HISTORY OF CURTAILMENT
 
 255
 Since the advent of natural gas scarcities in the early seventies, regulated interstate pipelines have been required to establish elaborate curtailment plans detailing which of their customers will get how much gas in what priority in times of short supply. In Congress' own words:
 
 
 256
 Curtailment plans establish priorities for the delivery of natural gas when supplies are insufficient to meet contract demand. In most cases, a local distribution company's entitlement to natural gas under a curtailment plan is determined by reference to the priorities of use, and volumes of gas used, by its customers during a particular base period.
 
 
 257
 H.R.Rep.No. 1750, 95th Cong., 2d Sess. 112-13 (1978), U.S.Code Cong. & Admin.News 1978, p. 7846, J.A. 39-40.
 
 
 258
 However, these plans often fall short of full effectiveness or equity because they cover only pipelines' direct customers. As we have decided today, the plans cannot assure that the ultimate users receive the benefit (or burden) of a statutory or FERC-ordered priority system unless they obtain their gas supply directly from an interstate pipeline. In general, local (non-interstate) distributors of natural gas allocate their supplies according to state law,[2] which may or may not correspond to the federal scheme. Moreover, many distributors have several sources of supply, enabling them to dispense nonfederally regulated gas during times of shortage.[3]
 
 
 259
 Despite such problems, the FERC initially chose to develop curtailment plans allocating gas by end use rather than pro-rating contract entitlements. In pre-NGPA priority schedules, agricultural users were not accorded any special priority. As a result, two-thirds of the agricultural sector's 1977 interstate natural gas supply fell in the lowest, and most likely to be curtailed, priorities.[4] It was this situation which Congress sought to change by passage of the NGPA.
 
 
 260
 Once basic priorities were established, the FERC faced a further problem: how to decide how much gas is required by each priority class. In most cases, the FERC calculated the amount by reference to historical usage in a pre-curtailment year. Base period figures were adjusted for factors unique to particular pipelines, and particular years.[5] However, they did not normally take into account new or expanded uses of gas developed after the base year.
 
 
 261
 The base year approach has several advantages. It (1) permits predictability so that customers can plan ahead for shortage periods, (2) encourages conservation and (3) discourages irresponsible load growth by refusing to recognize new or expanded uses occurring after the base year during curtailment. Although this court has indicated that the base year concept must be intelligently applied in individual cases to ensure that it does not indiscriminately utilize stale data to bring about a result at odds with the overall priorities accorded current end users, it has never ruled use of a base year illegal per se. See North Carolina v. FERC, 584 F.2d 1003 (D.C.Cir.1978);[6] Southern California Edison Co. v. FPC, 524 F.2d 409 (D.C.Cir.1975); Rhode Island Consumers' Council v. FPC, 504 F.2d 203 (D.C.Cir.1974). And, although post-base year customers must be served during curtailment periods through use of supplementary "self-help" sources, see note 3 supra, this feature does not create insurmountable problems. As petitioners point out, agricultural production expanded 40% between 1974-1979 even when it had no statutory priority and had to be accommodated chiefly through such means. Even now, the government suggests "self-help" gas answers the needs of new load-growth among the highest priority residential users.[7]
 
 
 262
 In the past, the Commission rejected the "current requirements" method of computing allocations because of its administrative complexity and unpredictability, as well as its unfortunate tendency to encourage distributors to recruit new priority users during shortages.[8] Nonetheless, the Secretary of Agriculture now claims that only the current requirements method is "sufficiently flexible and responsive to provide for natural gas requirements necessary for full food and fiber production in all instances."[9] The problem in this case arises, however, not so much from the Secretary's position qua certification, as from the FERC's unquestioning acceptance of this certification for implementation purposes and its concomitant disclaimer of any power to make offsetting changes or accommodations necessary to insure that the overall curtailment plan works effectively and is in line with Congressional objectives.[10] The resultant disparity between treatment of load-growth in the top three priority classes will almost certainly have substantial, unpredictable and, I am convinced, largely unintended effects on the national consumption patterns for natural gas.[11]II. THE ISSUE
 
 
 263
 Section 401(a) of the NGPA requires the Secretary of Energy to prescribe, within 120 days of enactment, a rule that provides "to the maximum extent practicable" that interstate pipeline curtailment plans not curtail gas deliveries to "essential agricultural users" below the amount certified by the Secretary of Agriculture as necessary to meet the "requirements" of such users, unless a reduction is "necessary in order to meet the requirements of high priority users."[12] Section 401(c) in turn requires the Secretary of Agriculture to certify to the Secretary of Energy and the FERC the "natural gas requirements (expressed as volumes or percentages of use) for essential agricultural uses" that are necessary to achieve "full food and fiber production."
 
 
 264
 The FERC argues that these subsections of 401, when read together, leave it no option but to implement the whole of the Secretary of Agriculture's certification of need, regardless of whether that certification is based on current requirements estimates or, as are other priority categories, on base year calculations. It therefore has refused to pass on the wisdom or necessity of the Secretary of Agriculture's adoption of a current requirements entitlement scheme.[13]
 
 
 265
 The petitioners, however, point to the language of section 403 of the NGPA, 15 U.S.C. Sec. 3393, which provides that "the Commission shall implement the rules ... pursuant to its authority under the Department of Energy Organization Act to establish, review, and enforce curtailments under the Natural Gas Act." (Emphasis supplied.) They argue that this language preserves the Commission's traditional broad authority to implement curtailment priorities and policies, and that its failure to exercise that authority in this instance has resulted in an unfair and unworkable rule which violates rather than advances Congressional intent.
 
 
 266
 Indeed, the majority has accepted part of petitioner's argument; it finds the rule as it stands incomprehensible and unworkable. However, it would apparently remand only to allow the FERC to change its base year curtailment rule for high priority users to provide for load-growth in order to bring about some kind of parity with new agricultural users. In my view, this approach does not go far enough in recognizing the FERC's authority under section 403 of the NGPA to fashion curtailment rules for all priority (and non-priority) classes that will operate fairly and efficiently in accord with the NGPA's priority scheme. Though the language in sections 401 and 403 delegating authority to the various agencies is admittedly ambiguous and hard to follow, the accompanying legislative history makes clear that the FERC has been delegated the ultimate power and responsibility to accommodate the Secretary of Agriculture's certification to the overall statutory priority scheme, and to the Congressional directive that there be minimum disruption to pre-existing curtailment plans.
 
 III. ANALYSIS
 
 267
 Section 401 of the NGPA was passed as part of a broader gauged energy package consisting of five separate acts.[14] The entire legislative package was debated on and off for over a year, with most of the debate focusing on pricing policies for natural gas. The provision of a special curtailment priority for agriculture was given relatively little attention and considered essentially noncontroversial.[15] It was motivated by the FPC's past refusal to give agricultural users any special priority in curtailment plans, and the perceived results of that failure, i. e., lack of gas in times of shortage for irrigation, heating hen houses, fueling refrigeration plants, etc.[16]
 
 
 268
 Senators Ford and Jackson submitted the basic language of section 401 on September 19, 1977 as an amendment to the Senate bill then under consideration on the floor; the amendment had already been adopted by a majority of the Committee in an earlier version of the bill. It provided that no pipeline or local distribution company could curtail agricultural use deliveries below those certified as essential by the Secretary of Agriculture. But it also expressly provided that the Secretary of Agriculture's certification could include extended production capacities or new facilities only if determined by the Secretary to be necessary to meet national food and fiber production and to preserve health, safety or welfare.[17] Moreover, this amendment provided that the Secretary of Agriculture was to determine the essential agricultural uses while the FERC would determine the volumes necessary to meet those uses. The phrase "full food and fiber production" was later substituted for "national food and fiber production" in an apparent effort to insure that the "full cyclical process of raising or preparing food for market" was included in designated essential agricultural uses.[18]
 
 
 269
 At this juncture, then, the amendment gave the Secretary of Agriculture no power at all to certify amounts or volumes but only the uses essential to food and fiber production. The amounts necessary to meet those uses were to be fixed by the FERC, presumably in accommodation with all other aspects of pipelines' curtailment plans, including the needs of other statutorily mandated priorities.
 
 
 270
 As finally passed by the Senate, however, the "agricultural use" curtailment amendment applied only to interstate pipelines[19] and although it delegated to the Secretary of Agriculture the power to certify amounts as well as uses, it made provision for "present and expanded capacity" in existing and future plants for only two uses, raw material feedstock or process fuel and production of fertilizer and essential agricultural chemicals. Other essential agricultural uses apparently were not to be permitted such "load growth." As in the final version of section 401, there was no reference to the method to be used to certify "requirements" for agricultural uses, or any indication that it should be different from that currently used to determine the "requirements" of other priority classifications protected by the statute.
 
 
 271
 The House-passed counterpart was a different animal altogether because it attempted to regulate the curtailment priorities of interstate and intrastate pipelines and local distribution companies. The Secretary of Agriculture was to identify essential uses and determine the "supply requirements including requirements from capacity extensions" needed "to satisfy the requirements of full food and fiber production and processing." In the context of the House bill, a certification of current requirements made administrative sense since the curtailment plan could be imposed to effect priorities at the burner tip level by application to local distribution companies as well as intrastate and interstate pipelines.
 
 
 272
 The Conference Committee, however, adopted the more limited Senate provision "with certain modifications." Curtailment priorities applied only to interstate pipelines, not to local distribution companies. There was no express authorization for new or expanded agricultural uses or any reference to "load growth" in the statute itself. As to the Secretary's certifying power the Report said only:
 
 
 273
 The conference agreement gives authority to the Secretary of Agriculture to certify to the Secretary of Energy and to the Commission the natural gas requirements for agricultural uses in order to meet the requirements of full food and fiber production, based upon the definition of "agricultural use" contained in this section.
 
 
 274
 (Emphasis supplied.)[20] The Report was silent on the subject of what FERC must do with the certification, referring in general terms to the Secretary of Energy's responsibility for adjusting, according to the statutory plan, the "schedule of curtailment priorities."[21]
 
 
 275
 Moreover, the Report stressed, repeatedly and emphatically, that Congress did not wish to open up existing curtailment plans, particularly base year calculations, any more than was absolutely necessary.
 
 
 276
 Once the schedule of curtailment priorities is brought into conformity with the requirements of this Act, the Commission will be required to implement the revised curtailment priority schedule applicable to interstate pipelines. For purposes of implementing this section, the Commission is instructed to reopen curtailment plans that are already in effect under the Natural Gas Act only to the extent necessary to adjust those plans to bring them into conformity with the new curtailment priority schedule. The conferees were concerned that these changes not burden the Commission with lengthy proceedings which might throw existing curtailment plans into disarray. Therefore, the conference agreement includes the term "to the maximum extent practicable" to assure that the Commission has the necessary flexibility in implementing any changes. For example, the conferees do not intend the reopening of curtailment plans for this limited purpose to result in adoption of a new base year for curtailment purposes.
 
 
 277
 (Emphasis supplied.)[22] Contrary to the majority opinion's finding of an "absence of any ... precise indication from Congress," maj. op. at 1341, it is hard to think of a clearer Congressional signal that the FERC had discretion to allocate scarce gas to the newly established priority classes under the base year system it had traditionally used.
 
 
 278
 So far as I can see, then, there is nothing in the text or legislative history of the Act to suggest that section 401 was meant to strip the FERC of its traditional powers to balance needs and make the myriad of accommodations necessary for a coherent curtailment implementation scheme. The most logical interpretation of the relationship between the FERC and the Secretaries of Agriculture and Energy is that the Secretary of Agriculture would designate the essential uses and the percentages or volumetric quantities necessary for "full food and fiber production," the Secretary of Energy would incorporate those uses into his "priority schedule" rule, and then the FERC would proceed to "implement" that rule, i. e., accommodate the volume or percentage certifications with other priorities and general curtailment policies required under the Natural Gas Act. Given the fact that Congress knew--and had indeed decided for itself--that only deliveries to pipelines, not burner tip users, were to be regulated by the federal curtailment scheme, there is no reason to believe--and nothing in the legislative history to indicate--that the Commission could not treat the Secretary's essential agricultural uses certification as it does estimates of needs of other priorities.[23]
 
 
 279
 In short, I believe that Congress, well aware of the varied and complex issues associated with the curtailment process,[24] meant to keep the FERC's power "to implement" curtailment priority rules intact, although assigning to another agency the power to define a user class with a specified placement in the priority hierarchy and quantify its needs. If, as a result of the rule before us, Title IV of the NGPA is interpreted otherwise, i. e., to lay down an aberrational and inflexible method of allocation for one priority class, regardless of other considerations, the flexibility of the FERC "to administer curtailments" will have been gravely and unwisely, and I believe unnecessarily, limited. I therefore dissent from approval of the FERC's refusal to utilize its much needed "expertise" to resolve this complex curtailment problem.
 
 
 
 *
 Parts II.A.2 and II.A.3 of this opinion are superseded by the en banc opinion of Oct. 1, 1982, printed at 694 F.2d 778
 TABLE OF CONTENTS*
 
 
 *
 Parts II.A.2 and II.A.3 of this opinion are superseded by the en banc opinion of Oct. 1, 1982, printed at 694 F.2d 778
 Page
Introduction .............................................................. 737
 I. Defining the Curtailment Plans' Coverage
 A. Capacity Curtailment ........................................... 740
 B. The Pass-Through or Tracing Issue .............................. 741
 C. Allocation Formula ............................................. 743
 II. Implementation of Statutory Priorities
 A. Setting Volumetric Requirements for the
 Agricultural and High Priority Users
 1. Certification by the Secretary of
 Agriculture ................................................. 746
 2. Implementation of the Secretary's
 Certification by the Federal Energy
 Regulatory Commission ....................................... 749
 3. Retention of Base Years for High
 Priority Users .............................................. 751
 B. Defining the Scope of the Priority
 Classifications
 1. Manufacture of Pharmaceuticals and
 Medical Devices ............................................. 754
 2. Alternate Fuel Test for High Priority
 Users ....................................................... 755
 3. Storage Gas ................................................. 756
 4. Plant Protection Gas ........................................ 761
 5. Offshore Gas ................................................ 762
 III. Procedural Challenges
 A. Environmental Impact Statement ................................. 767
 B. Separate Implementation of Section
 401(b) ......................................................... 769
Conclusion ................................................................ 771
 
 
 [1]
 United Distribution Companies, The Brooklyn Union Gas Company, Columbia Gas Transmission Corporation and Washington Gas Light Company (the UDC Group) seek to preserve a substantive attack made on the now-expired Interim Curtailment Rule (the Interim Rule), 18 C.F.R. Sec. 281.101 et seq., Joint Appendix (J.A.) at 198-247, on the grounds that some pipeline deliveries were in fact made to competing agricultural users on the basis of the Interim Rule and on the grounds that in certain instances the effect of the Interim Rule has been perpetuated either by FERC's approval of curtailment plan settlements made under the Interim Rule or by FERC's granting extensions of time to file the curtailment plans required by the final rule. Although insisting that the Interim Rule has continuing effect, the UDC group does not point to a single claim made with respect to the Interim Rule that is distinguishable from the claims it vigorously urges upon this court in its challenge of FERC's final rule (Order No. 29). In fact, it states, "the Commission committed substantially the same errors in its promulgation of the Interim Curtailment Rule and Order No. 29." Reply Brief for UDC Group at 28. To the extent the Interim Rule survives, therefore, the issues raised by the UDC Group are resolved in our discussion in the text of the various arguments made with respect to the Commission's final rule. Whatever live issues remain are subsumed within the more general attack upon the final rule; separate treatment of these issues is accordingly unnecessary
 
 
 [2]
 While we review the rule that FERC has already placed in effect, we note that a proposed new rule, 45 Fed.Reg. 49087 (1980), could alleviate several of the concerns petitioners express here
 
 
 [3]
 The Commission argues that we lack jurisdiction to decide this issue because it was not raised by any petitioner in a petition for rehearing. Relying upon Ecee, Inc. v. FERC, 611 F.2d 554 (5th Cir. 1980), the Commission contends that a petition for rehearing is a jurisdictional prerequisite to judicial review of rules it promulgates under the NGPA. We note, however, that the petition for rehearing of the Fertilizer Institute, one of the parties which joined the Agricultural Petitioners' brief, does raise the capacity curtailment issue. See J.A. 1702-03. The issue is therefore properly before this court
 
 
 [4]
 The Agency's statement that persons facing capacity curtailments "may avail themselves of their Natural Gas Act remedies" does not necessarily mean that the NGPA is inapplicable to capacity curtailments, since FERC's authority to implement the NGPA's curtailment priorities derives from its authority "to establish, review and enforce curtailments from the Natural Gas Act." 15 U.S.C. Sec. 3393(b). We note that ERA has proposed a regulation which defines "curtailment" to include capacity shortages, 45 Fed.Reg. 49101 (1980) (proposed Section 580.02(b)(3))
 
 
 [5]
 For convenience, the arguments of the Agricultural Petitioners (Br. at 36-52), Allied Chemical (Supplemental Br. and Supplemental Rep. Br.), and Eli Lilly & Co. (Br. at 16 n.21) will be referred to as the arguments of the Agricultural Petitioners
 
 
 [6]
 Final Rule, 44 Fed.Reg. 26855 (1979), J.A. 304
 
 
 [7]
 Order Amending Regulation, Grant in Part and Denying in Part Petitions for Rehearing, 44 Fed.Reg. 61338 (1979), J.A. 390
 
 
 [8]
 See 18 C.F.R. Sec. 281.209 (1980)
 
 
 [9]
 The intervenors include Entex, Inc., Air Products and Chemicals, Inc., Stauffer Chemical Co., and Willamette Industries, Inc. All are full requirement customers of United Gas Co. (United). United filed a brief raising identical issues; the Commission urges us to dismiss its petition for lack of jurisdiction, alleging that it failed to file the timely application for rehearing which FERC contends is a jurisdictional prerequisite to judicial review. See note 3 supra. We see no reason to decide this legally and factually complex issue; the Commission concedes that each issue addressed by the challenged petitions has been raised in at least one unchallenged review petition, FERC Br. at 94, and thus is properly before the court for decision. Cf. Ripon Society v. Nat'l Rep. Party, 525 F.2d 567 (D.C.Cir.1975) (en banc) (court declined to decide whether Ripon Society had standing, since at least one other named plaintiff had standing to raise each issue)
 
 
 [10]
 Section 4(b) of the NGA, 15 U.S.C. Sec. 717c(b), provides that:
 No natural gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service. [Emphasis supplied.]
 
 
 [11]
 Petitioners argue that the Commission failed to conform to the procedural mechanisms for implementing and changing curtailment programs contained in sections 4 and 5 of the NGA, 15 U.S.C. Secs. 717c-d
 
 
 [12]
 The NGPA curtailment priorities are detailed in section 401 of the Act, 15 U.S.C. Sec. 3391
 
 
 [13]
 Interim Curtailment Rule, 18 C.F.R. Sec. 281.101 et seq. (Mar. 6, 1979), J.A. 198
 
 
 [14]
 Curtailments varied widely, both among sections of the country and among pipelines serving the same geographical area. See Note, Administrative Law--Natural Gas Regulation: FERC Must Consider Actual Impact of Curtailment Plans, 57 N.C.L.Rev. 287, 299 & n.64 (1979)
 
 
 [15]
 Louisiana detailed a hypothetical in which such disparities would result. It is contained at pages 12-14 of the Joint Brief of Petitioner and Intervenors. The example presented below was worked out by a panel of this court in North Carolina v. FERC, supra, 584 F.2d at 1013
 Company A and Company B have identical requirements by priority. If Company A obtained half of its gas from Transco during the 1972-1973 base period and half from Pipeline X, Transco would be assigned half of each of Company A's priorities. If Transco curtailed at 40% and Pipeline X curtailed at 20%, Company A's curtailment would be 30% of its total supply. If Company B were supplied entirely by Transco, it would be curtailed 40%. If the priority 1 and 2 requirements of each were 65% of its total requirements, Company A would be able to supply all of its priority 1 and 2 needs and have 5% of its total supply available for lower priorities. Company B, on the other hand, would have to curtail its priority 2 market by 5% of its total supply (which may be substantially more than 5% of just its priority 2 market). The effect then is that Company B must curtail a portion of its priority 2 market in order that Company A can sell inexpensive pipeline gas to its priority three market.
 
 
 [16]
 North Carolina was decided prior to the enactment of the NGPA
 
 
 [17]
 North Carolina v. FERC, supra, 584 F.2d at 1011
 
 
 [18]
 Id. at 1011-12
 
 
 [19]
 Id. at 1012, 1015
 
 
 [20]
 Id. at 1013 n.20
 
 
 [21]
 Order No. 29-C, supra note 7, 44 Fed.Reg. 61338, 61340 (footnotes omitted), J.A. 398
 
 
 [22]
 The Commission granted United, petitioners' supplier, interim relief which allows United to continue curtailing under its pre-existing curtailment plan. See Order of the Director Office of Pipeline and Producer Regulation Granting Interim Relief and Petitions to Intervene and Staying Proceeding, Br. for Respondent FERC app. A. Hearings on a final settlement have been held, and an administrative law judge has recommended that United be given the permanent relief it seeks. The decision of the administrative law judge is currently awaiting consideration by the Commission
 
 
 [23]
 Petitioners decry the supposed lack of interim relief, hearings on adjustment issues, and a deadline for Commission action on adjustment requests. Joint Br. of Petitioner and Intervenors at 25-26
 
 
 [24]
 FERC denies that the safeguards detailed above are missing from the adjustment procedure, see Br. for Respondent FERC at 78-79, and United's experience with it tends to bear out FERC's rebuttal. See note 22 supra
 
 
 [25]
 Petitioners seem most upset by FERC's repeated statements that it does not consider itself bound by North Carolina. Joint Br. for Petitioner and Intervenors at 25-28. They also note that FERC has resisted positions advocated by them in other cases involving similar issues. Id. Petitioners appear to interpret each Commission action, however narrow or ambiguous in intent or effect, as directly contrary to their own goals. For example, the Commission is correct in stating that it is questionable whether North Carolina, decided under the NGA, binds its actions in this proceeding. See H.R.Rep.No.1752, 95th Cong., 2d Sess. 113 (Commission instructed to reopen curtailment plans in effect under the NGA only to extent necessary to conform with NGPA). Moreover, as discussed above, the Commission bears different evidentiary and analytical burdens when promulgating a rule than when enforcing one in a particular situation. Thus, FERC's disclaimer of North Carolina 's effect on this proceeding does not necessarily reflect a similar view of its impact on adjustment proceedings, and need not be read as contrary to petitioners' interests
 
 
 [26]
 See note 22 supra
 
 
 [27]
 See NGA Sec. 4(c), 15 U.S.C. Sec. 717c(c); NGA Sec. 16, 15 U.S.C. Sec. 717 o ; Department of Energy Organization Act Sec. 402(h), 42 U.S.C. Sec. 7172(h)
 
 
 [28]
 See Permian Basin Area Rate Cases, supra, 390 U.S. at 777-781, 88 S.Ct. at 1365-1367 (section 4 not violated by a moratorium on rate increases above a fixed ceiling); FPC v. Texaco, Inc., 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964) (section 4 does not preclude Commission from particularizing statutory standards through the rule-making process); Pacific Gas & Elec. Co. v. FPC, 506 F.2d 33, 41 (D.C.Cir.1974) ("Commission free to initiate a rulemaking proceeding to establish a binding substantive rule")
 
 
 [29]
 Pipelines, contrary to petitioners' contentions, remain free to file any tariff they choose. The adoption of the challenged rule merely warns them in advance that they will have to justify any disparity from the Commission's norm
 
 
 [30]
 Natural gas is a crucial energy source in the food and fiber system. It is a major feedstock and fuel in the manufacture of nitrogen and other fertilizers and pesticides; it powers irrigation pumping and dries crops such as corn, rice, peanuts and hay; and it is the principal fuel for food processing .... From input supply to cooking in the home, natural gas is a major fuel used in the food system
 Natural gas is similarly important in fiber production and processing. For instance, it is extensively used in manufacturing fertilizer for cotton production, pumping irrigation water for millions of acres of cotton, and conditioning cotton for ginning and compressing. Natural gas is also used in processing fiber crops throughout the textile industry and in the transformation of raw wood into lumber, pulp, plywood and paper products.
 The production and processing of food and fiber commodities is a continuous process. Agricultural activities are biological in nature and involve the growing of plants and animals and the conversion of these perishable commodities into products to feed, clothe and shelter mankind. Once an agricultural activity is started, it must be carried through to completion; or significant losses can occur. Consider, for example, the production of milk. Once a cow starts producing milk, she continues to produce through about a 305-day period. This product must be quickly cooled and then processed for use by humans. It is pasteurized, fortified, modified as to fat content, and packaged. If not all is needed as fresh milk, some is processed further into dried skim milk products and butter, evaporated milk, or cheese and whey products. The processing must take place shortly after production, or bacteria can cause the milk to spoil.
 Natural gas is also used in the manufacture and sealing of sanitary food containers. Milk carton blanks, for example, are shipped flat from the paper manufacturer to the dairy. As needed, they are creased, formed, filled and sealed. The sealing is performed under an open natural gas or LP gas flame. Temperature is critical to proper sealing. Otherwise, containers leak, and products are no longer in a sanitary environment.
 The curtailment of natural gas in the food system is especially burdensome on food industries and, ultimately, on food supplies. During the winter of 1976-77, certain dairy processing plants faced curtailment of interstate gas supplies. One dairy processing plant was within hours of closing, and the 3,000 dairy farmers who produced milk for the plant were in danger of having to dump their milk because there was no place to store it safely. Natural gas supply was restored in time to avert this closure.
 During the winter of 1976-77, several million broiler chickens died in Arkansas because the interstate supply of natural gas was curtailed to feed mills, and feed supplies were exhausted. Broiler processing plants were curtailed with less than 4-hours' notice. Birds had been trucked to the plants for processing, where they froze to death on the trucks.
 Disruption of natural gas supplies to the food and fiber sector also results in increased prices to consumers across a broad range of purchases and contributes substantially to inflationary pressures in the general economy. The curtailment priority in Section 401 is designed to avoid such detrimental effects on farmers, agricultural suppliers, processors and marketers, consumers, and the Nation's economy. J.A. 80-82.
 
 
 **
 This subsection and subsection II.A.3 are superseded by the en banc opinion of October 1, 1982, printed at 694 F.2d 778
 
 
 [31]
 Order Denying Rehearing of Interim Curtailment Rule, No. RM 79-13 (June 20, 1979) at 9, J.A. 257
 
 
 ***
 This subsection and subsection II.A.2 are superseded by the en banc opinion of Oct. 1, 1982, printed at 694 F.2d 778
 
 
 [32]
 "In all other respects, it is the Commission's intention to preserve the existing base period data and method of implementation of existing interstate pipeline curtailment plans." Order No. 29, supra note 6, 44 Fed.Reg. 26858, J.A. 319
 
 
 [33]
 Order No. 29-C, supra note 7, 44 Fed.Reg. 61342, J.A. 405
 
 
 [34]
 See text accompanying note 31 supra
 
 
 [35]
 Br. for FERC at 62-63
 
 
 [36]
 The Commission also cites the Public Utilities Regulatory Policies Act (PURPA) Conference Report, H.R.Rep. No. 95-1750, 95th Cong., 2d Sess. 113 (1978); J.A. 39, as support for its interpretation. One paragraph of the PURPA Report notes that Title IV of the NGPA does not require updating of the base periods on which curtailment plans are based. This no more supports the use of base periods for some classes and not for others than does similar language from the legislative history of the NGPA
 
 
 [37]
 Since we find that the Commission is not authorized by the statute to undercut the priority for high-priority users we need not reach the petitioner's second argument
 
 
 [38]
 Lilly is also a petitioner in those cases relating to agricultural production, in its status as a producer of agricultural products
 
 
 [39]
 Lilly did not file these materials with the Court. At oral argument, counsel for Lilly stated that Lilly did not wish to have the materials reviewed by the Court. However, in response to a question, counsel amended that statement to state that review was requested in the event the Court was to rule against Lilly. Review of the documents was made at the outset to assure full review of Lilly's claim
 
 
 [40]
 At Economic Regulatory Administration (ERA) hearings Lilly presented comments which addressed this issue in broad brush fashion:
 Lilly realizes that in an emergency some of its products are more essential than others. However, Lilly drug products and medical devices which are life-saving and life-sustaining or otherwise intended for the diagnosis, prevention and treatment of disease must be considered essential and their production afforded a high priority. [J.A. 49.]
 Lilly failed to use this observation to provide specific instances of the need for gas supplies to assure the availability of truly life-saving or life-sustaining products, either at the administrative hearings or at the appellate review level.
 
 
 [41]
 Because of our disposition of this issue we do not reach the question of whether the case-by-case consideration by FERC that ERA proposed would be an adequate alternative to classification of pharmaceutical manufacturers as high priority users. Although Lilly dismisses this possibility as inadequate on the assumption that FERC-directed relief "would come too late and would be temporary," Lilly Br. at 12, we note that this is an alternative which might be explored given our resolution of the issue
 Lilly also states that it cannot
 hold out much hope that ERA will include the manufacturing of pharmaceuticals as a high-priority use in ERA-R-79-10 [a separate proceeding] in view of ERA's statement at page 61 of the Executive Agencies' [Departments' Joint] Brief that Lilly 'has been expressly informed that its manufacturing processes are not to be included in the high-priority category.'
 Lilly Reply Br. at 14, n.12.
 Lilly takes that statement out of context. In the Departments' brief, the statement is used to refute Lilly's contention that DOE failed to address, in its final rule, whether pharmaceutical manufacturers were to be placed in the high priority category as users whose curtailment would endanger "life" or "health." Properly read, the Departments' statement is intended to refute Lilly's contention that it did not consider the question by showing the issue was considered, and that Lilly was expressly advised of its resolution. We do not read the statement to bar Lilly from receiving consideration of its request in the pending separate proceeding.
 
 
 [42]
 Although petitioners argue that apartment houses should also be subjected to the alternate fuel test, the Conference Report indicates that apartment houses are residences covered by NGPA Sec. 401(f)(2)(A), 15 U.S.C. Sec. 3391(f)(2)(A), and not schools, hospitals or similar institutions covered by NGPA Sec. 401(f)(2)(C). See Conference Report at 113. Thus the section of the Conference Report relied upon by petitioners is inapplicable to apartment houses
 
 
 [43]
 See, e. g., Comments of Southern California Gas Company, J.A. at 559; Comments of Northern Illinois Gas Company, J.A. at 572-73; Comments of the State of Texas, J.A. at 614-15; Comments of Arkansas Louisiana Gas Company, J.A. at 657
 
 
 [44]
 FERC's general policy that curtailment should be based upon end use was expressed in FPC Order No. 467, 49 FPC 85 (1973). Title IV of the NGPA codified this policy
 
 
 [45]
 See, for example, the priorities established in the curtailment plan approved in 1976 for the Transcontinental Gas Pipe Line Corp., in Opinion No. 778, 10 Fed. Power Serv. (M-B) 5-1045 (1976):
 (1) Residential and small commercial requirements less than 50 Mcf on a peak day.
 (2) Large commercial requirements of 50 Mcf or more on a peak day, except for commercial boiler fuel requirements above 300 Mcf/d; industrial requirement for plant protection, feedstock and process needs; and storage injection requirements.
 (3) All other industrial requirements below 300 Mcf/d.
 (4) Industrial requirements not specified in (2)(6)(7)(8) and (9) of more than 300 Mcf/d but less than 3000 Mcf/d.
 (5) Industrial requirements not specified in (2)(6)(7)(8) and (9) of more than 3000 Mcf/d.
 (6) Boiler fuel requirements of more than 300 Mcf/d but less than 1500 Mcf/d.
 (7) Boiler fuel requirements of 1500 Mcf/d or more but less than 3000 Mcf/d.
 (8) Boiler fuel requirements of 3000 Mcf/d or more but less than 10,000 Mcf/d.
 (9) Boiler fuel requirements of 10,000 Mcf/d or more.
 This plan was examined by this court and remanded for further proceedings in North Carolina v. FERC, supra.
 
 
 [46]
 Order No. 29, supra note 6, 44 Fed.Reg. 26858, J.A. 322-23
 
 
 [47]
 NGPA Sec. 401(f)(2)(D), 15 U.S.C. Sec. 3391(f)(2)(D)
 
 
 [48]
 NGPA Sec. 403(b), 15 U.S.C. Sec. 3393(b)
 
 
 [49]
 DOE Notice of Proposed Rulemaking and Public Hearing at 5, J.A. 47
 
 
 [50]
 Id. at 9, J.A. 51
 
 
 [51]
 See, e. g., Comments of Brooklyn Union Gas Company at 3 & n.3 (Jan. 22, 1979), J.A. 662; FERC's "Analysis & Recommendations" with Respect to DOE's Proposed Rule, 44 Fed.Reg. 15471 (1979), J.A. 66-67
 
 
 [52]
 See, e. g., Comments of Brooklyn Union Gas Company (Jan. 22, 1979), J.A. 663
 
 
 [53]
 See, e. g., Comments of United Distribution Companies (Jan. 9, 1979), J.A. 563-564; Comments of Northern Illinois Gas Company (Jan. 19, 1979), J.A. 569-571
 
 
 [54]
 FERC Notice of Proposed Rulemaking at 3, 44 Fed.Reg. 3725 (1979), J.A. 267; Order No. 29, supra note 6, 44 Fed.Reg. 26859, J.A. 322-323
 
 
 [55]
 See, e. g., Comments of the American Gas Association (Mar. 13, 1979), J.A. 1368; Comments of Brooklyn Union Gas Company (Mar. 23, 1979), J.A. 1609
 
 
 [56]
 See, e. g., Comments of General Service Customer Group (Mar. 20, 1979), J.A. 1441-42; Comments of Northern Illinois Gas Company (Mar. 20, 1979), J.A. 1469-71; Comments of United Distribution Company (Mar. 20, 1979), J.A. 1592-94
 
 
 [57]
 Order No. 29-C, supra note 7, 44 Fed.Reg. 61343, J.A. 408-09
 
 
 [58]
 See, e. g., Joint Br. of Atlanta Gas Light Company and Consolidated Edison Company of New York at 30; Br. of United Distribution Companies, et al., at 59
 
 
 [59]
 DOE is presently considering a modification of section 580.03(d), the rule set out in text preceding note 54 supra. See Proposed Rulemaking Concerning Review and Establishment of Natural Gas Curtailment Priorities for Interstate Pipelines, 45 Fed.Reg. 45114 (1980). Its new proposal for section 580.03(d) reads as follows:
 Nothing in this rule shall prohibit the injection of natural gas into storage by interstate pipelines or deliveries to the customers of interstate pipelines for their injection into storage, unless it is demonstrated to the Commission that these injections or deliveries are not reasonably necessary to meet the requirements of high priority or essential agricultural, industrial process and industrial feedstock uses in their respective order of priority.
 Though this proposed rule emphasizes more than the existing one that storage gas is subject to the general curtailment priority scheme, the accompanying comments make it crystal-clear that FERC is to retain flexibility for the handling of storage gas. Id. at 45104. DOE flatly denies an intent to require any particular treatment of storage gas:
 most agreed that the major purpose of storage injections is to protect high priority customers and that either method would do this. We see no valid reason to mandate that all pipelines use one method or the other .... Hence, the proposed rule does not specify a method.
 Id.
 
 
 [60]
 FERC Order No. 27, Final Rule, 44 Fed.Reg. 24825 (1979), J.A. 448-75 (Order No. 27)
 
 
 [61]
 See, e. g., American Pub. Gas Ass'n v. FERC, 587 F.2d 1089, 1097-98 (D.C.Cir.1978) (per curiam)
 
 
 [62]
 That section provides:
 The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--
 (A) natural gas sold by the producer to such person; and
 (B) natural gas produced by such person.
 Id. FERC and its predecessor, the Federal Power Commission (FPC), had previously exercised authority to certify direct sales under Order No. 533, 40 Fed.Reg. 41760, 54 F.P.C. 821 (1975) (Order No. 533), and FERC Order No. 2, 43 Fed.Reg. 5362 (1978) (Order No. 2). The statement of authority under Order No. 533 was affirmed by this court in American Pub. Gas Ass'n v. FERC, supra, 587 F.2d at 1097-98. Our blessing of the program was both tentative and limited, however:
 We approve the Commission's plan embodied in Order No. 533 as a legitimate, experimental approach for dealing with the inherently skewed nature of our half-free market.... This approval is as to the general policy, as an experimental effort.... It is not at this stage to be condemned illegal root and branch.
 Id. at 1098. Apparently referring to the cautious language of approval used in American Pub. Gas, the PURPA conference committee explained that section 608 of the PURPA, quoted above,
 is intended to remove any uncertainty which may exist regarding the basis for present Federal Energy Regulatory Commission policy regarding the transportation of user-owned natural gas by interstate pipelines. However, the conference substitute is not intended to require the Commission to issue a certificate of public convenience and necessity in any specific case. The question of whether to issue a certificate is left to the Commission based upon its determination of whether the transportation of the gas will serve the public convenience and necessity. In addition, limitations are not imposed on the exercise of this authority by the Commission other than the public convenience and necessity standard which is generally applicable to certification by the Commission of natural gas transportation.
 H.R.Rep.No.1750, 95th Cong., 2d Sess. 119 (1978), U.S.Code Cong. & Admin.News 1978, p. 7852, J.A. 39, 42.
 
 
 [63]
 The Commission allows "eligible users" who own and develop their own reserves to apply for a term of up to 10 years "upon a showing that such longer term is necessary to permit the economical recovery of the reserves." 18 C.F.R. Sec. 157.105(a)(2), J.A. 472. The extended term is not available to eligible users "who merely acquire reserves-in-place," Order No. 27, supra note 60, 44 Fed.Reg. 24828, J.A. 464, nor is it available as a matter of course in any case. The Commission promises only that it will "entertain requests" for such terms. Id. The availability of an extended term is meant to provide "eligible users" with an incentive to develop new natural gas supplies. Notice of Proposed Rulemaking at 14, 44 Fed.Reg. 7742 (1979), J.A. 431
 
 
 [64]
 Order No. 27, supra note 60, 44 Fed.Reg. 24828, J.A. 463 (preamble) ("[C]omments received during the Commission's consideration of 18 C.F.R. 2.79 indicate that more than two years are required to attract many of the potential sources of new gas supplies"). See also Comments of Glass Containers Corporation at 8 (Mar. 20, 1979), J.A. 1859 (favoring new program's "increase in available certificate term over the maximum two year authorization currently available under Sec. 2.79"); Comments of Owens-Corning Fiberglas Corporation at 5 (Mar. 20, 1979), J.A. 1893 (suggesting that certification under new program not be limited to a term of years); Comments of Reynolds Metals Company at 8 (Mar. 20, 1979), J.A. 1901-02 (favoring new program's longer certificate term). Order No. 27 supplements rather than supplants the Commission's direct sale authority already stated in Order No. 533, supra note 6, and Order No. 2, id., and codified at 18 C.F.R. Sec. 2.79 (1979). See Order No. 27, supra note 60, 44 Fed.Reg. 24827, J.A. 459 (preamble). Certificates under 18 C.F.R. Sec. 279 (1979) are limited to a maximum term of two years. Id. at Sec. 2.79(i)
 
 
 [65]
 Order No. 27, supra note 60, 44 Fed.Reg. 24828, J.A. 463
 
 
 [66]
 Comments of First Mississippi Corporation at 5 (Mar. 20, 1979), J.A. 1437. See Order No. 27, supra note 60, 44 Fed.Reg. 24826, J.A. 452 (preamble) (summarizing comments)
 
 
 [67]
 Notice of Proposed Rulemaking, 44 Fed.Reg. 7742 (1979), J.A. 430-31. See also Order No. 27, supra note 60, 44 Fed.Reg. 24828, J.A. 463. It is in part the construct of the program itself which permits the public interest to be jeopardized by direct sales. As promulgated, the program operates outside the framework of curtailment priorities. See 44 Fed.Reg. 24826, J.A. 450-51. When the program was first proposed, the FERC solicited comments on the possibility of making direct sales "interruptible" when gas supplies were short, 44 Fed.Reg. 7742 (1979), J.A. 432-33, but in its final rule the agency decided against imposing such a condition on its program, noting that the President is authorized under section 303(d) of the NGPA to redirect direct sales during declared natural gas supply emergencies, 44 Fed.Reg. 24826, J.A. 452-53
 
 
 [68]
 44 Fed.Reg. 7742, J.A. 430
 
 
 [69]
 Id
 
 
 [70]
 Comments of Glass Containers Corporation at 9 (March 20, 1979), J.A. 1860 (favoring availability of ten year term regardless of ownership); Comments of Owens-Corning Fiberglas Corporation at 4-5 (March 20, 1979), J.A. 1892-93 (favoring availability of term for "a period of time necessary to permit the economic development of the reserves whether this period is five years, ten years or twenty years); Comments of Reynolds Metal Company at 9 (March 20, 1979), J.A. 1902 (favoring availability of ten year term regardless of method of acquisition)
 
 
 [71]
 Comments of Associated Gas Distributors at 2-3 (March 12, 1979), J.A. 1840-41 (favoring continuation of two year terms); Comments of Northern Illinois Gas Company at 3, 15 (March 20, 1979), J.A. 1866, 1878 (favoring two year term); Comments of Northern Natural Gas Company at 6 (March 20, 1979), J.A. 1887 (favoring two year terms for user purchased transportation, five year terms for user produced transportation)
 
 
 [72]
 Arizona Elec. Power Coop., Inc. v. FERC, 631 F.2d 802, at 809 (D.C.Cir., 1980) ("The difficult problem of balancing competing equities and interests has been given by Congress to the Commission ... [I]t is not the role of the courts to second guess the Commission's judgment ... so long as the agency's determination has a rational basis")
 
 
 [73]
 Joint Brief for Petitioner First Mississippi Corporation and Supporting Intervenors (hereinafter "Mississippi Brief") at 14-15
 
 
 [74]
 See S.Rep.No.436, 95th Cong., 1st Sess. 21 (1977), U.S.Code Cong. & Admin.News 1978, p. 7659 (interstate-intrastate distinction "unworkable" in times of shortage); 11 St. Mary's L.J. 140, 142-45 (1979) (same). See also MacAvoy, The Natural Gas Policy Act of 1978, 19 Nat. Resources J. 811, 814 (1979) (economic analysis of interstate gas shortage)
 
 
 [75]
 Order No. 533 excluded gas obtained from wells located on "off-shore federal domain" from its direct sale policy because:
 One of the main goals of our statement of policy is to make gas otherwise sold only to the intrastate market available to the interstate market. The transportation or sale of gas from the offshore federal domain is by definition transported or sold in interstate commerce.
 
 
 [40]
 Fed.Reg. 41763 (1975). FERC continued this exclusionary policy. See Tenneco Oil Co., et al., FERC Opinion No. 10 (March 20, 1978), reh. denied, FERC Opinion No. 10-A (June 21, 1978) (denying applications for permits for direct sale of OCS gas). The petitioners are challenging these denials in court, Air Products & Chemicals, Inc. v. FERC, 650 F.2d 687 (5th Cir.) (consolidated with Public Service Commission of New York v. FERC, No. 78-1572 (D.C.Cir.) (transferred to 5th Cir. May 27, 1980))
 
 
 [76]
 Conference Report for Public Utility Regulatory Policies Act, H.R.Rep.No.1750, 95th Cong., 2d Sess. 118-19 (1978), U.S.Code Cong. & Admin.News 1978, p. 7852, J.A. 41-42 (Sec. 7(c) of the Natural Gas Act amended "to remove any uncertainty which may exist regarding the basis for present ... Commission policy regarding the transportation of user-owned natural gas by interstate pipelines ... [and does not] require the Commission to issue a certificate in any specific case") (emphasis added)
 
 
 [77]
 15 U.S.C. Sec. 3375(b) provides:
 (b) Offers; right of first refusal.--
 (1) Application.--This subsection shall apply with respect to any natural gas which is committed or dedicated to interstate commerce on November 8, 1978, and which is--
 (A) high-cost natural gas (as defined in section 3317(c)(1), (2), (3), or (4) of this title);
 (B) new natural gas (as defined in section 3312(c) of this title); or
 (C) natural gas produced from any new, onshore production well (as defined in section 3313(c) of this title).
 This subsection shall not apply to any natural gas committed or dedicated to interstate commerce solely by reason of section 3301(18)(A)(i) of this title.
 (2) Offer of sale.--The Commission shall, by rule, require that if natural gas subject to the requirements of this subsection is produced on or after the first day of the first month beginning after November 9, 1978, a bona fide offer to sell such natural gas must be made to the person who, but for the provisions of section 3431(a)(1)(B) of this title (relating to deregulation), would have been entitled pursuant to the commitment or dedication of such natural gas to interstate commerce to receive such natural gas if such natural gas were sold (or any successor in interest to such person).
 (3) Right of first refusal.--The Commission shall, by rule, require that following--
 (A) the expiration or termination of any contract with respect to the first sale of natural gas subject to the requirements of this subsection to the person who, but for the provisions of section 3431(a)(1)(B) of this title (relating to deregulation), would have been entitled pursuant to the commitment or dedication of such natural gas to interstate commerce to receive such natural gas if such natural gas were sold (or any successor in interest to such person), or
 (B) any rejection of any bona fide offer, described in paragraph (2), to sell natural gas subject to the requirements of this subsection,
 such person who would have been entitled to receive such natural gas shall be granted a right of first refusal of the first offer to sell such natural gas which, subject to the exercise of any right of first refusal under this paragraph, has been substantially accepted in principle by another person in an arms-length transaction.
 
 
 [78]
 Id
 
 
 [79]
 15 U.S.C. Sec. 3301(18)(A)(ii) defines the term "committed or dedicated to interstate commerce" to include: "natural gas which, if sold, would be required to be sold in interstate commerce (within the meaning of the Natural Gas Act) under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act." The Natural Gas Act, the predecessor of the NGPA, regulated all natural gas flowing in interstate commerce prior to the enactment of the NGPA on November 9, 1978. See 15 U.S.C. Sec. 717(b). Therefore, all gas purchased from a well which sold gas in interstate commerce on or before November 8, 1978 is within the definition of gas "committed to or dedicated to interstate commerce" under the NGPA. See Conoco, Inc. v. FERC, 622 F.2d 796, 798 (5th Cir. 1980), (NGPA definition of gas dedicated to interstate commerce on November 8, 1978 included all gas from wells leased or even if not flowing in interstate commerce prior to enactment of NGPA)
 
 
 [80]
 15 U.S.C. Sec. 3301(18)(A)(i)
 
 
 [81]
 15 U.S.C. Sec. 3375(b)(1) explicitly provides that "[t]his subsection shall not apply to any natural gas committed or dedicated to interstate commerce solely by reason of section 3301(18)(A)(i) of this title."
 
 
 [82]
 First Mississippi Br. at 11-12
 
 
 [83]
 124 Cong.Rec. H13,128 (daily ed. Oct. 14, 1978) (remarks of Reps. Eckhardt, Dingell and Brown)
 
 
 [84]
 See Conference Report on Public Utility Regulatory Policies Act, H.R.Rep.No.1750, 95th Cong., 2d Sess. 118-19 (1978), U.S.Code Cong. & Admin.News 1978, p. 7659, J.A. 41-42. But see 124 Cong.Rec. S15413 (daily ed. Sept. 19, 1978) (remarks of Sen. Abourezk (noting FERC's inclusion of OCS gas in interstate market); 124 Cong.Rec. 16245 (daily ed. Sept. 27, 1978) (remarks of Sen. Hollings) (same)
 
 
 [85]
 Order No. 533, supra note 62
 
 
 [86]
 American Pub. Gas Ass'n v. FERC, supra, 587 F.2d at 1098
 
 
 [87]
 Id
 
 
 [88]
 The authorizing section for the entire NGA provides that the regulation "is necessary for the public interest." 15 U.S.C. Sec. 717(a). No certificate can be obtained under the Act unless the Commission finds the proposed action "necessary or desirable in the public interest." 15 U.S.C. Sec. 717f(a). Indeed, the certificate is one "of public convenience or necessity." See also note 62 supra (similar authority under PURPA)
 
 
 [89]
 Notice of Proposed Rulemaking at 3, 44 Fed.Reg. 7740 (1979), J.A. 420. See also Notice of Proposed Rulemaking at 7, 44 Fed.Reg. 3053 (1979), J.A. 180 (preamble). But see Order No. 29, supra note 6, 44 Fed.Reg. 26857-58, J.A. 316-18 (decision to superimpose curtailments upon existing contractual relationships)
 
 
 [90]
 Notice of Proposed Rulemaking at 4, 44 Fed.Reg. 7740 (1979), J.A. 421
 
 
 [91]
 Id. at 10, J.A. 427
 
 
 [92]
 See note 67 supra. But see Order No. 29, supra note 6, 44 Fed.Reg. 26857, J.A. 316 (curtailment system operates at direct sale customer's option)
 
 
 [93]
 Order No. 27, supra note 60, 44 Fed.Reg. 24827, J.A. 456-58 (exclusion necessary to avoid disruption of OCS supply patterns)
 
 
 [94]
 Because of the bifurcated price structure created by the NGA, interstate pipelines were unable to compete with intrastate ones for new sources of supply. Order No. 533, supra note 62, 40 Fed.Reg. 41763. Thus, the customers of interstate pipelines suffered the brunt of gas shortages. Direct sales were conceived of as a way to augment these customers' supplies. Id. However, such augmentation was not to have been at the expense of other interstate pipeline customers (or the entire curtailment structure would have been undermined); hence, sources of gas already dedicated to interstate commerce were excluded from it. This resulted in the exclusion of the bulk of OCS gas from the program in the first instance. Id. This exclusionary policy is presently being challenged in the Fifth Circuit. See note 75 supra
 
 
 [95]
 18 C.F.R. 157.104(b), J.A. 472. See also Order No. 27, supra note 60, 44 Fed.Reg. 24828, J.A. 463 (summary of final rule)
 
 
 [96]
 FERC Br. at 92; see also Order No. 27, supra note 60, 44 Fed.Reg. 24827, J.A. 456
 
 
 [97]
 The issue is raised by the Process Gas Consumers Group, et al. (Process Gas), the United Gas Pipeline Company (United), and the United Distribution Company, et al. (UDC)
 
 
 [98]
 15 U.S.C. Sec. 3391(b)
 
 
 [99]
 FERC Notice of Proposed Rulemaking at 4-5, 44 Fed.Reg. 3052 (1979), J.A. 177-78
 
 
 [100]
 FERC Order No. 29-C, supra note 7, 44 Fed.Reg. 61339, J.A. 393-94
 
 
 [101]
 FERC Order No. 55, Interim Rule, 44 Fed.Reg. 62484 (1979)
 
 
 [102]
 FERC Order No. 55-A, 44 Fed.Reg. 65585 (1979)
 
 
 [103]
 Great Western Sugar Co. v. FERC, No. 79-2472 (D.C.Cir., filed Dec. 12, 1979)
 
 
 [104]
 Process Gas makes three arguments. First, it contends that the decision to defer issuing regulations regarding alternate fuel capability was "arbitrary and capricious," Process Gas Br. at 62, because "neither Order No. 29 nor the Notice of Proposed Rulemaking ... explained why a separate proceeding was necessary or why a finding as to alternate fuel capability must be deferred...." Id. at 61. Secondly, it argues that the decision resulted in allocations being made contrary to the statutory priorities: "... agricultural uses with installed alternate fuel capability have been in a higher priority than industrial process and feedstock users which lack alternate fuel capability." Id. at 62-3. Finally, Process Gas contends that FERC took an unreasonably long time to issue the curtailment regulations, thereby "abus[ing] ... its statutory discretion." Id. at 62
 United makes two arguments. First is the statutory argument made by Process Gas, that "implementation of Section 401 without regard to the alternate fuel capability test would be contrary to the statute." United Brief at 15. Alternatively, United argues that Order No. 29 "is tied to an erroneous standard for determination of alternate fuel capability." Id. at 17.
 UDC argues that the interim rule, by "eliminating, without explanation, any reference to alternative fuel" was a clear violation of FERC's statutory mandate "to have such alternate fuel determinations made." UDC Br. at 62. Moreover, it contends, FERC's postponement of "hard issues," "thereby creating moving targets for parties to its proceedings," id. at 63, constitutes an abuse of discretion.
 
 
 [105]
 See NGPA Sec. 401(a), 15 U.S.C. Sec. 3391(a)
 
 
 [106]
 123 Cong.Rec. H13,237 (daily ed. Oct. 14, 1978) (remarks of Rep. Ashley) ("specific target date")
 
 
 [107]
 In fact, the conference report places so many limitations on the implementation of the provision that it is clear that overuse, rather than delayed implementation, of the provision was their chief concern. Conference Report, H.R.Rep.No. 1752, 95th Cong., 2d Sess. 114 (1978)
 
 
 [108]
 FERC itself recognized at an early point that the statute established different priorities for implementation of its provisions. FERC Order Denying Rehearing of Interim Curtailment Rule at 12-13, 44 Fed.Reg. 37204 (1979), J.A. 260-61
 
 
 [109]
 Conference Report, H.R.Rep.No. 1752, 95th Cong., 2d Sess. 114 (1978) U.S.Code Cong. & Admin.News p. 9030 ("The Commission, in consultation with the Secretary of Agriculture, will determine if alternative fuels are economically practicable and reasonably available....") (emphasis added)
 
 
 [110]
 Order No. 29, supra note 6, 44 Fed.Reg. 26855, J.A. 305
 
 
 [111]
 Order No. 29-C, supra note 7, 44 Fed.Reg. 61338, J.A. 393. It would, of course, have been better had FERC stated its reasons more fully in the first instance. See, e. g., North Slope Borough v. Andrus, 486 F.Supp. 332, 345 (D.D.C.1979), aff'd, No. 78-1976 (D.C.Cir., Feb. 11, 1980) (NEPA requirement of reasoned environmental impact statement "designed to insure decisions are fully informed and well considered"). In the absence of prejudice to the parties, we can, however, look to subsequently issued orders to remedy that defect. See, e. g., United States v. Benmar Transp. & Leasing Corp., 444 U.S. 4, 100 S.Ct. 16, 62 L.Ed.2d 5 (1979) (lack of statutorily required finding of consistency with "public interest and with the national transportation policy" in ICC order may be remedied in subsequent order)
 
 
 [112]
 Petitioner UDC
 
 
 [113]
 UDC Br. at 63
 
 
 [114]
 FERC also argues that this issue has become mooted by its issuance of Orders 55 and 55-A, implementing section 401(b) of the NGPA. However, these rules have no retroactive effect, and thus do not moot petitioners' challenge to the validity of the provision during the interim between the effectiveness of the two sets of orders. Nor do they moot the procedural questions raised by petitioners' challenge. See American Dairy of Evansville, Inc. v. Bergland, 627 F.2d 1252 (D.C.Cir.1980). Compare Tennessee Gas Pipeline Co. v. FPC, 606 F.2d 1373, 1380-82 (D.C.Cir.1979)
 
 
 [1]
 The resulting rule could utilize base year or current requirements entitlement schemes, a combination of both, if justified, or neither. The one set of proposed regulations noticed subsequent to the rule involved here suggests market mechanisms rather than curtailment plans may be the preferred method of reconciling the statutory goals. See Notice of Hearing & Public Comment on Proposed Rulemaking Concerning Review and Establishment of Natural Gas Curtailment Priorities for Interstate Pipelines, 45 Fed.Reg. 49087, 49091 (1980) (hereinafter July 1980 Proposed Rulemaking ) ("Our studies indicate that a pricing system has the greatest potential of any alternative examined for achieving these benefits [of minimizing the costs of curtailment] since it provides a means to move gas to the industrial end users who value it most, while avoiding the costs associated with mandated shifts of supply")
 
 
 [2]
 Many states have utility commissions or statutes which mandate curtailment priorities for intrastate distributors
 
 
 [3]
 Local distributors very often rely on multiple supply sources to meet their retail demands; some also invest in gas storage facilities for peak periods; still others maintain synthetic natural gas facilities or propane-air plants or make arrangements to buy directly intrastate supplemental gas supplies. Additionally, many companies take gas from more than one interstate pipeline, which may be suffering varying degrees of curtailment. Thus, in times of shortage, local distribution companies may have gas which they are permitted or required to dispense according to different priorities than the federally prescribed ones. In this way they may be able to accommodate new as well as existing customers even though their curtailment share of the regulated pipeline's supply is based on a long gone base year
 
 
 [4]
 Final Economic and Environmental Impact Statement, U.S. Dept. of Agric., May 14, 1979 at 17 (Table 5), J.A. 946
 
 
 [5]
 Thus as PGC suggested in its comments on the USDA draft environmental impact statement, J.A. 865-67, "base periods can be adapted to meet fluctuating demands" through normalization of the base period figures if "the base year was abnormal," and the introduction of weather variables (i. e., a "temperature sensitive factor" and a "wetness sensitive factor"). The volumes in the base periods of existing pipeline curtailment plans may reflect many factors unique to each pipeline (e. g., gas supply and demand projections, certificate and contract obligations, technical and engineering capabilities, storage and peak shaving capabilities of distributor-customers, end use and weather). For example, on Panhandle Eastern Pipe Line Company's system, a 12-month pro forma year is used as the base period. The data for this base period reflect the highest monthly use over a 30-month period during which there was no curtailment
 
 
 [6]
 "[D]iscrimination resulting from an end-use plan can be justified only to the extent that the plan actually does protect the high priority uses from curtailment ahead of low priority uses." North Carolina v. FERC, supra, 584 F.2d at 1010
 
 
 [7]
 See July 1980 Proposed Rulemaking at 49095
 
 
 [8]
 See July 1980 Proposed Rulemaking at 49097; Recent Decisions, 47 Geo. Wash.L.Rev. 829, 842 (1978). Among the identified problems with a "current requirements" standard are: choosing a method and frequency for determining "current requirements"; determining the credibility of estimates prepared by distributors who know that their pipeline supply is a function of those estimates; and the effect of fluctuation in "current requirements" on industry and administrative planning
 
 
 [9]
 Final Rule, 44 Fed.Reg. 28782, 28785 (May 1979), J.A. 163
 
 
 [10]
 See Order No. 29, 44 Fed.Reg. 26855, 26857 (May 2, 1979), J.A. 315-16
 
 
 [11]
 Under the final rule, distributors will receive an allocation computed from a base year profile for all priorities except agricultural uses, which will be computed (within contract levels) according to current requirements. Ballooning agricultural uses could thus cut off both the supply to lower priority users and to new users of higher priority users. In fact, in times of shortage, distributors serving primarily agricultural users may receive a higher percentage of their normal supply than distributors serving primarily customers in the highest priority class
 One of the petitioners cites an example of the gross discrimination that could result as follows:
 Assuming that only 150,000 dt of gas were available for both distributors, Distributor A would, under the Commission's rule, acquire volumes for its post base period agricultural market up to its contract with the pipelines. Here it would receive the full 50,000 dts. Distributor B's post base period high priority market would receive not one dt because its high priority users would be limited to their base period volumes. In essence, gas would be taken away from high priority markets and given to a Congressionally dictated lower priority.
 Application of Consolidated Edison Company for Rehearing, FERC Docket No. RM 79-15, J.A. 1638.
 Distributor A Distributor B
 (Farm Belt) (City)
Contract 100,000 dts 100,000 dts
Base Period High
Priority Users Volumes 25,000 50,000
Base Period Agricultural
Users Volumes 25,000 0
Post Base Period High
Priority Market 0 50,000
Post Base Period
Agricultural Market 50,000 0
 
 
 [12]
 Section 401(f) of the NGPA, 15 U.S.C. Sec. 3391(f), defines high priority users as:
 (2) High-Priority User.--The term "high-priority user" means any person who--
 (A) uses natural gas in a residence;
 (B) uses natural gas in a commercial establishment in amounts of less than 50 Mcf on a peak day;
 (C) uses natural gas in any school, hospital, or similar institution; or
 (D) uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property.
 
 
 [13]
 However, in its initial and interim rule proposals, the FERC took a broader view of its statutory authority and proposed to compute the "requirements for essential agricultural uses" on a base year period. See Notice of Proposed Rulemaking, 44 Fed.Reg. 3052, 3053-54 (Jan. 10, 1974), J.A. 184; Notice of Proposed Rulemaking, 44 Fed.Reg. 3725, 3727 (Jan. 12, 1979), J.A. 270-71
 
 
 [14]
 The five were the Energy Tax Act of 1978, Pub.L.No.95-618, the National Energy Conservation Policy Act of 1978, Pub.L.No.95-619, the Powerplant and Industrial Fuel Use Act of 1978, Pub.L.No.95-620, the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Pub.L.No.95-617, and the NGPA. All were signed into law on November 9, 1978
 
 
 [15]
 See 123 Cong.Rec. S15771 (daily ed. Sept. 27, 1977) (remarks of Sen. Bumpers)
 
 
 [16]
 See, e. g., id. at S15772 (remarks of Sen. Bumpers) ("In February 1977, for example, 4.7 million chickens died in Arkansas as the result of lack of natural gas, either because of feed mills being shut down, or because no gas was available to heat chickenhouses. In March of 1977, 1.8 million chickens died from the same causes")
 
 
 [17]
 123 Cong.Rec. S15160 (daily ed. Sept. 19, 1977)
 
 
 [18]
 See 123 Cong.Rec. S15772 (daily ed. Sept. 17, 1977) (remarks of Sen. Ford) ("It is our intention that all activities encompassed within the term 'food processing' should be eligible for priority consideration"); cf. 124 Cong.Rec. S14957 (daily ed. Sept. 12, 1978) (remarks of Sen. Talmadge) ("The definition of essential uses in agriculture should be interpreted in the broadest possible concept so that our food and fiber production continues without impairment")
 
 
 [19]
 Senators Pearson and Bentsen had proposed an amendment to the Senate bill on September 16, 1977, which provided for an agricultural priority. When explaining their amendment, Senator Pearson remarked of the curtailment scheme:
 The intent of this section is to specify by statutory language those categories of service to receive natural gas in order of priority pursuant to Federal curtailment plans. New section 25 does not expand the statutory scope as judicially construed, of current curtailment authority....
 
 
 [123]
 Cong.Rec. S15099 (daily ed. Sept. 16, 1977). Senators Ford and Jackson then proposed their amendment to the bill which would have included local distribution companies within the coverage of curtailment plans. 123 Cong.Rec. S15159 (daily ed. Sept. 19, 1977). Senator Jackson later proposed a further amendment dealing with agricultural priorities identical in language to the earlier Pearson-Bentsen amendment. 123 Cong.Rec. S15771 (daily ed. Sept. 27, 1977). On October 4, 1977, the day the bill passed the Senate, Senators Pearson and Bentsen submitted a revised amendment, as a substitute for their earlier amendment, which reiterated their earlier limitation on the scope of curtailment plans. This amendment was then adopted, and became an integral part of the Senate's energy package. 123 Cong.Rec. S16323-25 (daily ed. Oct. 4, 1977)
 
 
 [20]
 H.R.Rep.No.1752, 95th Cong., 2d Sess. 114 (1978), U.S.Code Cong. & Admin.News 1978, p. 9030
 
 
 [21]
 Id. at 113 (emphasis supplied)
 
 
 [22]
 Id. at 113, U.S.Code Cong. & Admin.News 1978, p. 9029. See also 124 Cong.Rec. S15431 (daily ed. Sept. 19, 1978) (remarks of Sen. Melcher) (the FERC "explain[s] in their assessment that 'that will require a limited reopening of the existing curtailment cases before the Commission for the purpose of establishing the entitlements' "); H.R.Rep. 1750, 95th Cong., 2d Sess. 112-113 (1978) (PURPA-Title II) ("the revisions required in title IV of the Natural Gas Policy Act of 1978 ... do[ ] not require an updating of the base period data"), J.A. 40. If updating is required, PURPA's specific requirement of computation or conservation comes into effect
 
 
 [23]
 In American Smelting & Refining Co. v. FPC, 494 F.2d 925 (D.C.Cir.), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), we remanded to the Commission for reconsideration an order using a different standard for computing curtailment allocations for one group of customers than for another
 
 
 [24]
 I am puzzled by the majority opinion's reference to the "mammoth assessment of historical usage" involved in use of the base year method, maj. op. at 1342. Quite the opposite is true--the base year allocations are already in place in individual pipeline curtailment plans and would remain generally static whereas the administrative complications of keeping up with constantly fluctuating and expanding "current requirements" are truly mind staggering